RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0088p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

EXPERT MASONRY, INC.,

   *Plaintiff-Appellant,*

   *v.*

BOONE COUNTY, KENTUCKY, FISCAL COURT; DON
SALYERS MASONRY, INC.; DON SALYERS; JOHN DOE
#2,

   *Defendants-Appellees.*

No. 05-5062

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 02-00275—David L. Bunning, District Judge.

Argued: December 2, 2005

Decided and Filed: March 8, 2006

Before: BOGGS, Chief Judge; BATCHELDER, Circuit Judge; and KATZ, District Judge.[*]

---

## COUNSEL

**ARGUED:** Charles F. Hollis, III, BENJAMIN, YOCUM & HEATHER, Cincinnati, Ohio, for
Appellant. Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, Covington,
Kentucky, Michael T. Sutton, SUTTON, HICKS, LUCAS, GRAYSON & BRADEN, Edgewood,
Kentucky, for Appellees. **ON BRIEF:** Charles F. Hollis, III, Thomas R. Yocum, BENJAMIN,
YOCUM & HEATHER, Cincinnati, Ohio, for Appellant. Jeffrey C. Mando, ADAMS, STEPNER,
WOLTERMANN & DUSING, Covington, Kentucky, Michael T. Sutton, SUTTON, HICKS,
LUCAS, GRAYSON & BRADEN, Edgewood, Kentucky, for Appellees.

---

## OPINION

---

  BOGGS, Chief Judge. Plaintiff-appellant is a company that bid on two public construction
projects, failed to win either of them, and now seeks to mend its misfortune by asking the federal
courts to reverse the buyer's judgment of the competing construction bids' relative merits.
Specifically, the appellant claims that the government purchasing entity and the winning private

---

  [*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by
designation.

bidder unlawfully conspired in violation of Section 1 of the Sherman Act, and also violated 42 U.S.C. § 1983 by unlawfully depriving the disappointed bidder of a vested property interest.

The district court granted summary judgment to the defendants with respect to all claims. We affirm.

## I

In 2001 and 2002, the Boone County, Kentucky, Fiscal Court ("BCFC") opened two construction bids in order to build a new courthouse and a new jail.[1] Expert Masonry, Inc. ("EMI"), an Ohio company, brought this suit challenging the process by which BCFC awarded the masonry contract for those projects to defendant Don Salyers and his wholly-owned company, Don Salyers Masonry, Inc. ("DSM"), a company based in Boone County, Kentucky. EMI initially challenged the jail project only, but later amended its complaint to add the earlier courthouse project to the lawsuit.

In February 2001, BCFC advertised for bids for the courthouse project. DSM submitted the lowest bid for the masonry work, in the approximate amount of $1.2 million, and EMI submitted the second-lowest bid, in the approximate amount of $1.38 million. BCFC awarded the contract to DSM. Although BCFC required successful bidders to submit performance bonds in the full bid amount, DSM submitted a bond only in the contract amount (that is to say, the bond excluded the materials costs). BCFC accepted the bonds, but no one appears to have noticed the discrepancy in the amount of the bond at the time. EMI did not challenge this bid until it amended its complaint in August 2003, although the courthouse project had already been completed.

In June 2002, BCFC published a request for proposals to build a new jail and sheriff's office. The jail project bid included a set of standard instructions (printed in 1997) stating that each bid had to be accompanied by a five-percent "bid bond," that successful bidders were required to furnish a one-hundred-percent "Performance and Labor and Material Payment" bond, and that any bid not accompanied by the required bid security or that was otherwise incomplete or irregular was "subject to rejection." These instructions also noted that BCFC reserved the right "to reject any or all Bids," and that BCFC "shall have the right to waive informalities and irregularities in a Bid received and to accept the Bid which, in [BCFC's] judgment, is in [BCFC's] own best interests." However, it was the "intent of [BCFC] to award [each contract] to the lowest qualified [bidder] provided the [bid has] been submitted in accordance with the requirements of the Bidding Documents and does not exceed the funds available." The specifications for the jail project also noted that the bond "shall be in the combined amount of the materials designated in its bid to be acquired by Purchase Order by the Owner and all remaining items of cost . . . ."

On July 25, 2002, DSM submitted a bid for the jail project without a bid bond. When the bids were opened, DSM had submitted the lowest bid for the masonry work, and EMI had submitted the second lowest bid, having bid approximately $292,000 more than DSM. EMI responded by requesting permission to examine the bid packages, and though Boone County Administrator James Parsons initially refused, saying "they are not public documents for everyone to finger through," another county official later relented. That was when EMI discovered that DSM had failed to submit a bid bond. DSM was the only bidder that failed to post a bond with its jail-project bid.

BCFC responded to EMI's subsequent complaint by rejecting all bids on the grounds that the bid had not been properly advertised, and BCFC then modified the bid announcement by

---

[1]"Fiscal Court" is the name that Kentucky traditionally assigns to county government bodies. The highest elective office in the fiscal court is called the "Judge-Executive," who is not a judge.

allowing bidders to post bid security in the form of either a bid bond or certified check.  When the jail-project bids were resubmitted on August 22, 2002, DSM submitted a cashier's check in lieu of a bid bond.  DSM was again the lowest bidder and EMI was again second, though EMI had narrowed the gap to approximately $145,000.  On September 3, and considering the August 30 recommendation of David Codell, who was charged with the construction of the jail project, BCFC passed a unanimous resolution awarding the jail project to DSM, subject to DSM's providing payment and performance security in the bid amount of approximately $3.2 million.

Codell demanded from DSM all documentation necessary to prepare the jail project contract on September 11, and, five days later, he demanded DSM's executed bonds.  He did not receive them.  On September 24, Codell and BCFC Contracts Administrator Robin Curry instructed DSM to commence work on the jail project on September 30.  However, DSM still failed to provide the requested security.  In an unusual turn of events, Curry personally visited DSM's office on October 7 to discuss the company's failure to provide security.  On October 17, Codell recommended to Curry that DSM's bid be rejected "because they have not been able to provide any type of Performance and Payment Bond."  On that same day, Curry drafted a memorandum to Boone County Administrator James Parsons recommending that DSM's bid be denied because DSM's "failure to provide security places Boone County at risk and has caused a substantial increase in the masonry costs."  He noted that "[w]hile we would prefer to have a Boone County operated company perform this work, [DSM] has failed to meet the bid specification."  BCFC apparently enjoyed the right to declare that DSM had forfeited its bid security (in the amount of approximately $160,000) and apply that amount toward the jail project, but BCFC chose not to do so.  Codell and Curry both recommended at this time that BCFC award the jail project to EMI.

For the October 22 BCFC meeting, a draft resolution was prepared to adopt Curry's recommendation to award the jail project to EMI.  Curry himself called EMI President Paul Brown on October 20 to inform him that he had requested that BCFC reject DSM's bid for lack of adequate security.  Codell also called EMI's Vice President on October 21 to inform him that EMI would be awarded the jail project.  On that same day, however, County Administrator Parsons and Boone County Judge-Executive Gary Moore called Salyers.  Salyers informed them that DSM had been unable to obtain the requested security, and Moore allowed Salyers until November 5 to obtain the security.  Judge-Executive Moore then removed the proposed resolution awarding the jail project to EMI from the BCFC's agenda, contingent on DSM's providing the requisite security.  On November 5, DSM obtained payment and performance bonds for the jail project that were said to be approximately $2.3 million, an amount that excluded the cost of materials.  The parties continue to dispute whether DSM's jail-project bonds ever met the county's specifications.

Construction manager Codell then informed Salyers that DSM's bond was insufficient, as the bond was in the contract amount (excluding materials costs).  Salyers responded by noting that BCFC had accepted DSM's bonds in the contract amount for the courthouse project, and, based on this past practice, Salyers asserted that his bonds were satisfactory.  Codell in turn called County Administrator Parsons to determine whether the County would deem this state of affairs acceptable, and Parsons concluded that the County was adequately secured.  DSM was then awarded the masonry work for the jail project.

On December 6, 2002, EMI filed suit against BCFC, Don Salyers, and DSM, alleging antitrust and other federal and state violations in the jail-project bidding process.  EMI specifically complained that BCFC illegally awarded the jail project to DSM in violation of the county's limited discretion under state procurement law, that it conspired to make the award in violation of Section 1 of the Sherman Act, and that the award to DSM abridged EMI's Fourteenth Amendment Due Process property interest in the jail project bid, in violation of 42 U.S.C. § 1983.  EMI also alleged state claims of fraud, collusion, tortious interference with business relations, and promissory

estoppel. EMI amended its complaint in August 2003 to add the circumstances of the courthouse project bidding process to its antitrust suit, specifically alleging that BCFC had accepted an inadequate performance bond from DSM in awarding the courthouse project. On May 18, 2004, following significant discovery, the defendants filed a motion for summary judgment. On November 29, 2004, the district court granted defendants' motion and dismissed all of EMI's claims. EMI raises only the antitrust and § 1983 claims on appeal.

## II

This court reviews an order granting summary judgment *de novo*. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), it must present significant probative evidence in support of its complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Ibid*. In this circuit, courts are generally reluctant to use summary judgment dispositions in antitrust actions due to the critical "role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference." *Smith v. N. Mich. Hosp., Inc.*, 703 F.2d 942, 947 (6th Cir. 1983).

## A

### 1

EMI alleges that the defendants conspired for BCFC to award the two construction projects to DSM in violation of Section 1 of the Sherman Act. That section states, in relevant part: "Every contract, combination . . . , or conspiracy, in restraint of trade or commerce among the several States, . . . is declared to be illegal." 15 U.S.C. § 1. As we have elaborated,

> to establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988) (quoting *Davis-Watkins Co. v. Serv. Merch.*, 686 F.2d 1190, 1195-95 (6th Cir. 1982) (citations omitted)). In the first instance, courts must distinguish between some types of unlawful anticompetitive restraints that "have such a clear lack of any redeeming virtue that any restraint of that type is conclusively presumed to be unreasonable," and are therefore *per se* illegal under the antitrust laws, and the far-larger type of restraints that should be analyzed under the "rule of reason approach that permits case-by-case evaluation of their effect on competition." *Bailey's, Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1027 (6th Cir. 1991) (citations and quotation marks omitted). The Supreme Court noted the purpose of the distinction and the standard of analysis more than two decades ago:

> *Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the

challenged conduct.  But whether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same – whether or not the challenged restraint enhances competition.

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Oklahoma*, 468 U.S. 85, 103-04 (1986).[2]

"If a court determines that a practice is illegal *per se*, further examination of the practice's impact on the market or the procompetitive justifications for the practice is unnecessary for finding a violation of antitrust law."  *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005) (citing *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003)).  Therefore, when a restraint is found to be proscribed *per se*, the plaintiff need only prove that (1) two or more entities engaged in a conspiracy, combination, or contract, *Guzowski v. Hartman*, 969 F.2d 211, 214 (6th Cir. 1992), (2) to effect a restraint or combination prohibited *per se* (wherein the anticompetitive effects within a relevant geographic and product market are implied), *Dunn & Mavis, Inc. v. Nu-Car Driveway, Inc.*, 691 F.2d 241, 245 (6th Cir. 1982), (3) that was the proximate cause of the plaintiff's antitrust injury, *Hodges v. WSM, Inc.*, 26 F.3d 36, 38 (6th Cir. 1994) ("plaintiffs seeking to recover damages in a private action against a violator of antitrust laws must demonstrate more than that they are in a worse position than they would have been had the violator not committed the antitrust conduct") (citation omitted).  *See Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004) (*per se* "liability attaches without need for proof of power, intent or impact").

Except where courts have already carved out certain categories of offenses as proscribed *per se*, "[t]here is an automatic presumption in favor of the rule of reason standard."  *Care Heating & Cooling*, 427 F.3d at 1012 (citations omitted).  As we have noted, "the essence of the Section 1 rule of reason analysis is whether the challenged agreement is one that promotes competition or one that suppresses competition.  This query must be resolved by distinguishing between conduct that injures *competition* and that which may injure *competitors*."  *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 505 (6th Cir. 1983) (quoting in part *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691 (1978)).  In order to establish a *prima facie* case under the rule of reason, the plaintiff must prove (1) that the defendants contracted, combined, or conspired; (2) that the scheme produced anticompetitive effects; (3) that the restraint affected relevant product and geographic markets; (4) that the object of the scheme and the conduct resulting from it was illegal; and (5) that the scheme was a proximate cause of the plaintiff's antitrust injury.  *Care Heating & Cooling*, 427 F.3d at 1014 (citing *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 907 (6th Cir. 1989), and *Crane & Shovel*, 854 F.2d at 805).  If the plaintiff satisfies this *prima facie* test, the burden shifts to the defendant to "come forward with evidence of the restraint's procompetitive effects to establish that the alleged conduct justifies the otherwise anticompetitive injuries;" if the defendant successfully makes this showing, the plaintiff "then must show that any legitimate objectives can be achieved in a substantially less restrictive manner."  *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers*, 323 F.3d at 718.  *See also Care Heating & Cooling*, 427 F.3d at 1012.

But distinguishing restraints that warrant application of the *per se* rule from those that qualify for rule of reason analysis is not always easy or straightforward.  As courts have taken a more

---

[2]The *NCAA* Court further noted that "there is often no bright line separating *per se* from rule of reason analysis. *Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct.  For example, while the Court has spoken of a 'per se' rule against tying arrangements, it has also recognized that tying may have procompetitive justifications that make it inappropriate to condemn without considerable market analysis."  468 U.S. at 104 n.26.

explicitly economic approach to antitrust, the old distinction between *per se* and rule of reason analysis has lost some of its former clarity, resulting in the advent of the so-called 'quick look' approach wherein the court must decide, in close cases, whether a restraint is facially anticompetitive before applying either *per se* or rule of reason analysis. *See NCAA*, 468 U.S. at 109 n.39 ("the rule of reason can sometimes be applied in the twinkling of an eye"). As the Supreme Court has stated:

> there is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.

*California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 780-81 (1999). Therefore, courts cannot act perfunctorily when distinguishing restraints that merit a *per se* approach from those that deserve rule of reason analysis, and only if a restraint clearly and unquestionably falls within one of the handful of categories that have been collectively deemed *per se* anticompetitive can a court be justified in failing to apply an appropriate economic analysis to make this determination.

By the same token, courts should remain alert to the fact that many restraints are in fact presumptively reasonable. After all, "[e]very agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence." *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918). *See Augusta News Co. v. Hudson-Portland News Co.*, 269 F.3d 41, 47 (1st Cir. 2001) ("The categorical descriptions of per se offenses are quite misleading for anyone not well versed in antitrust. For instance, price-fixing in its literal sense is not condemned per se: virtually every sale is an agreement on price"). For this reason, and it should be needless to point this out, a plaintiff must satisfy each element of the *per se* or rule of reason *prima facie* tests, whichever is applicable, in its allegations in order to survive pre-trial termination.

**2**

In analyzing the economics of any given restraint, and determining thereby which kind of legal treatment it merits, it is vital to distinguish between horizontal restraints that involve direct competitors at a given level of the market, and vertical restraints that typically involve entities that are upstream or downstream of one another. Under Section 1 of the Sherman Act, certain horizontal agreements are viewed as especially injurious, and courts therefore bar them *per se*, regardless of any alleged ameliorative rationale. *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *White & White v. Am. Hosp. Supply Corp.*, 723 F.2d at 504. These principally include price-fixing, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. at 692; *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 210 (1940), bid-rigging, *Stop & Shop v. Blue Cross & Blue Shield*, 373 F.3d at 62; *United States v. Dynalectric Co.*, Nos. 88-5118, 88-5119, 861 F.2d 722, 1988 U.S. App. LEXIS 14737, at *6-11 (6th Cir. Nov. 4, 1988), market allocation, *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, *aff'd*, 175 U.S. 211 (1899), group boycotts, *Fashion Originators' Guild v. Federal Trade Comm'n*, 312 U.S. 457 (1941), and certain tying arrangements, *Int'l Salt Co., Inc. v. United States*, 332 U.S. 392 (1947); *but see Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13-18 (1984) (requiring leverage to find tying).

On the other hand, vertical restraints generally represent a less apparent threat to competition, so the Supreme Court has reversed most of its earlier *per se* prohibitions of vertical restraints, *see Dr. Miles Med. Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911) (*per se* rule

against concerted vertical action to set prices through distribution), determining thereby that the rule of reason should be applied to vertical nonprice restraints, *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977) (overruling *United States v. Arnold, Schwinn & Co.*, 388 U. S. 365 (1967)); *Com-Tel, Inc. v. Dukane Corp.*, 669 F.2d 404, 408 (6th Cir. 1982) (recognizing that the Supreme Court "reinstated the rule of reason for vertical distribution restraints"), vertical maximum price fixing, *State Oil Co. v. Khan & Assocs., Inc.*, 522 U.S. 3 (1997) (overruling *Albrecht v. Herald Co.*, 390 U.S. 145 (1968)), and purely vertical (one buyer and one seller) boycotts, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998) (distinguishing the *per se* prohibition of group boycotts in *Fashion Originators' Guild of Am.*, 312 U.S. 457, and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959), because the boycotts in those cases included horizontal elements). In fact, it may well be the case that vertical fixing of minimum prices represents the only vertical restraint "which remain[s] illegal *per se*." *State Oil v. Khan*, 522 U.S. at 17. *See 324 Liquor Corp. v. Duffy*, 479 U.S. 335, 341 (1987) ("price maintenance has been a *per se* violation of § 1 of the Sherman Act since the early years of national antitrust enforcement") (citation and internal quotation marks omitted); *Bailey's v. Windsor America*, 948 F.2d at 1031-32 ("The courts may well be moving toward the view that vertical restrictions on intrabrand competition ought to be legal per se, at least where the defendant lacks 'market power'").

Here, the plaintiff has alleged that a buyer, who held two separate bidding procedures to hire contractors to work on two construction projects, conspired or schemed with one, and only one, of those bidders, and that, as a consequence, the buyer awarded the contracts to that bidder even though its bid may not have been the best (considering the cost of the risk associated with the winning bidder's purported failure to provide appropriate security). This supposed arrangement was transparently vertical in nature, as the buyer is downstream from the bidder. The plaintiff did not allege that any other bidders participated in this purported scheme. The scheme does not involve horizontal price fixing, horizontal group boycotts, horizontal bid-rigging, or vertical minimum price distribution restraints. At oral argument, the plaintiff could not identify any decision of this or other courts that would hold this alleged conspiracy to be unlawful under the antitrust laws. As we cannot find any other grounds for finding that the alleged scheme was unlawful *per se*, and because the economics of the supposed arrangement do not on their face require a presumption of anticompetitiveness, we must review the alleged acts under the rule of reason.

**3**

While we have stated that "[u]nder section 1, only after the court has found that there was a conspiracy will it examine whether the conduct was unreasonable," *Nurse Midwifery Assocs. v. B.K. Hibbett*, 918 F.2d 605, 612 (6th Cir. 1990), nevertheless, as an antecedent matter and in the interest of judicial economy, on a pre-trial motion a trial court should first take a quick look to satisfy itself that the plaintiff has sufficiently alleged a *prima facie* violation of the Sherman Act, especially including the *sine qua non* allegation of an injury cognizable under the antitrust laws. "Because evolving case law instructs us that the Clayton Act contemplates 'antitrust injury,' plaintiffs [are] required to allege antitrust injury in order to survive defendants' motion to dismiss." *Hodges v. WSM*, 26 F.3d at 38. *See Ezzo's Invs., Inc. v. Aveda Corp.*, No. 99-6489, 2000 U.S. App. LEXIS 33867, 2000-2 Trade Cas. (CCH) P73,142 (6th Cir. Dec. 19, 2000) (per curiam) ("We have suggested that a plaintiff must, at a minimum, set forth a claim under § 1 before proceeding to discovery"). As a general proposition, only after a court has satisfied itself that the plaintiff has stated a *prima facie* violation of the antitrust laws should it assess any affirmative defenses, such as the absolute immunity from antitrust damages enjoyed by local governments, 15 U.S.C. § 35(a), and state action immunity. *See Jackson, Tenn. Hosp. Co., LLC, v. W. Tenn. Healthcare, Inc.*, 414 F.3d 608, 611 (6th Cir. 2005) ("Under the so-called state action doctrine, it is well established that antitrust law does not apply to states acting as sovereigns") (citation and internal quotation marks

omitted)); *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 372-73 (1991); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 41-42 (1985).

It bears repeating that antitrust injury, the concept that lies at the very heart of antitrust law, is different from the ordinary meaning of tortious injury in the commercial context.[3] "The antitrust laws . . . were enacted for the protection of *competition*, not *competitors*." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (emphasis in original) (internal quotation marks omitted) (quoting in part *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489 (citing *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969)). "As the legislative history shows, the Sherman Act was enacted to assure customers the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of participants in the relevant market." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538 (1983) (discussing antitrust standing).

"The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce – in a word to preserve the right of freedom to trade." *United States v. Colgate*, 250 U.S. 300, 307 (1919). "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993). *See Ace Beer Distrib., Inc. v. Kohn, Inc.*, 319 F.2d 283, 286 (6th Cir.), *cert. denied*, 375 U.S. 922 (1963) ("Damage alone does not constitute liability under the [Sherman] Act"). Critically, the Supreme Court has warned that "it is inimical to the antitrust laws to award damages for losses stemming from continued competition." *Cargill, Inc. v. Monfort of Col., Inc.*, 479 U.S. 104, 109-10 (1986) (quoting in part *Brunswick Corp.*, 429 U.S. at 488). Courts must therefore find an allegation of cognizable antitrust injury in the complaint in order to avoid the real possibility that the antitrust action could itself have anticompetitive consequences.

It is clear that the injury alleged here has not been previously found to be a cognizable antitrust violation under the Sherman Act in analogous situations.[4] *Ace Beer v. Kohn*, 318 F.2d at

---

[3]"The antitrust injury doctrine . . . . has become a mainstay in the rather arcane network of doctrines by which courts, in keeping with the intent of the legislature, have attempted to confine antitrust litigation to 'economically rational limits.'" *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997) (citation omitted).

[4]Appellant relies heavily on some of our state action immunity cases involving the city of Detroit, but those cases can be readily distinguished from the alleged scheme here, and do not, therefore, represent any affirmation by us that the plaintiffs in those cases had alleged antitrust injury. In *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir. 2002), the plaintiffs alleged that the process by which the city solicited and accepted bids for a police telephone service violated Sections 1 and 2 of the Sherman Act. Although we dismissed that case on state action immunity grounds rather than a failure to state antitrust injury, that case does not represent an analogous situation to the instant case, for the alleged scheme involved two distinct products (construction of the network, and subsequent operation of telephone service) instead of the lone product here. As we stated, the "antitrust claims are based primarily on the allegation that Ameritech is engaged in a pattern of unlawful and/or anti-competitive conduct calculated to attempt to monopolize" the telephone market. *Id.* at 534. Similarly, it is true that we dismissed on state action immunity grounds an antitrust claim involving the city of Detroit and a successful bidder to build a local cable television system, but that case, like *Michigan Paytel*, was brought under Sections 1 and 2 of the Sherman Act, whereas, in our case, EMI limited its antitrust complaint to Section 1 of the Sherman Act. *City Commc'ns, Inc. v. City of Detroit*, 888 F.2d 1081, 1088 (6th Cir. 1989). Finally, we chose to analyze as an immunity case *Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265 (6th Cir. 1989). In that case, the plaintiffs alleged Sections 1 and 2 violations where Detroit and the private defendant agreed to build a hockey arena in Detroit, shirking the private defendant's informal agreement with the plaintiff to build an arena in Pontiac. But it should be noted that we quoted, with approval, the district court's statement that "The Court is . . . not

287 ("The substitution of one distributor for another in a competitive market . . . does not eliminate or materially diminish the existing competition of distributors of other beers, is not an unusual business procedure and, in our opinion, is not an unreasonable restraint of trade."); *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975) ("[I]t is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business.").

Moreover, there is no economic rationale to restrict, as a violation of Section 1, a buyer's latitude in selecting the entity from whom it will purchase products or services. Far from being anticompetitive, it is the appropriate nature of a functioning competitive marketplace that buyers are free to choose from whom they will buy, sellers are free to choose to whom they will sell, and salesmen battle and strive to curry favor and close the deal; whether the parties exercise wise business judgment in any given transaction is not a concern of the antitrust laws. *See United States v. Colgate*, 250 U.S. at 307 ("In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal"); *NYNEX v. Discon*, 525 U.S. at 137 ("The freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage").

To allow any auction, bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition and salesmanship, for companies and their staffs could not reasonably be expected to compete to win sales, projects, and new clients if, in so doing, they risk treble damages and even imprisonment when even one rival is disappointed with the results. For the courts to entertain such antitrust cases would require the courts themselves to substitute their own business judgment for that of the companies involved, but, as we have previously noted, "[c]ourts have no expertise to make such [business] judgments, and certainly antitrust liability cannot be premised on improvident business decisions." *Crane & Shovel*, 854 F.2d at 809. To do what plaintiffs ask would have an anticompetitive effect, and, in the absence of a showing of market power or some other convincing rationale, we decline to extend antitrust liability to give succor to dejected buyers or sellers who simply allege that one buyer and one seller colluded to reach a deal that may or may not have been inferior to the deal offered by the disappointed party.

The parties may break a host of state or federal laws and regulations in making a side deal or in otherwise circumventing the bidding process in reaching a final arrangement, but they do not breach Section 1 of the Sherman Act where the alleged vertical agreements involve only one buyer and one seller. Although the district court granted summary judgment based on its analysis of state action immunity, we explicitly do not reach the question of immunity because we find that the lack of any alleged antitrust injury is more than sufficient to affirm summary judgment here.

Furthermore, the plaintiff, apparently believing that the cause of action would be analyzed under the *per se* rules, did not allege that the defendants possessed market power, or identify any relevant geographic or product markets affected by the purported scheme. The plaintiff also did not sufficiently allege or demonstrate that it enjoys antitrust standing to bring the claim in the first place. Therefore, EMI failed to state a *prima facie* violation of Section 1 of the Sherman Act even had it

---

convinced that this agreement constitutes an antitrust violation. The City merely out-negotiated plaintiff and offered the Norris Group a better deal." *Id.* at 1272. Therefore, although we chose to decide these cases on immunity grounds, we did not thereby affirm that the plaintiffs had alleged antitrust injury. For the reasons stated above, we now believe that judicial economy dictates a quick look at the plaintiff's allegation of injury to determine whether it is potentially cognizable under the antitrust laws.

alleged it suffered antitrust injury, providing a further basis to affirm the district court's grant of summary judgment.

**B**

EMI claims that it had established a cognizable property interest in the two projects, and that BCFC abrogated EMI's constitutional rights when it awarded the projects to DSM. As this court has noted:

> A constitutionally protected property interest in a publicly bid contract can be demonstrated in two ways. A bidder can either show that it actually was awarded the contract and then deprived of it, or that, under state law, the County had limited discretion, which it abused, in awarding the contract.

*Enertech Electrical, Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 260 (6th Cir. 1996) (citations omitted). In the instant case, EMI relies on the second part of this test because BCFC never awarded the contracts to EMI. Therefore we must ascertain whether BCFC had limited discretion in awarding the contract and, if so, whether BCFC abused that discretion when it awarded the contracts to DSM.

Boone County has not adopted the Kentucky Model Procurement Code, Ky. Rev. Stat. Ann. § 45A.005 *et seq.* ("KMPC"). Instead, BCFC derives its procurement authority from another state law, which states:

> The fiscal court shall have the power to carry out governmental functions necessary for the operation of the county. Except as otherwise provided . . . the fiscal court of any county may enact ordinances, issue regulations, levy taxes, issue bonds, appropriate funds, and employ personnel in performance of the following public functions: . . . . (e) Provision of corrections facilities and services, and programs for the confinement, care, and rehabilitation of juvenile law offenders; . . . . (p) Provision of public buildings, including armories, necessary for the effective delivery of public services; . . . .

Ky. Rev. Stat. Ann. § 67.083(3). Kentucky courts have construed this grant of discretion broadly. Even in jurisdictions that have adopted the KMPC, there is a "presumption of correctness" regarding purchasing decisions, and the law "states the finding of the public officials carrying out the code shall not be disturbed unless the decision was procured by fraud or the findings of fact by such official . . . do not support the decision." *Pendleton Bros. Vending, Inc. v. Ky. Fin. & Admin. Cabinet*, 758 S.W.2d 24, 30 (Ky. 1988).

This court has upheld summary judgment in favor of a Kentucky municipality (and a private partner) that had granted an exclusive cable television franchise to a private entity in spite of a challenged bidding process, *Commc'n Sys., Inc. v. City of Danville, Ky.*, 880 F.2d 887 (6th Cir. 1989), and we noted that Kentucky law "authorizes municipalities to grant such franchises to the highest and best bidder and reserves to the municipality the right to reject any and all bids." *Id.* at 893. In so doing, we merely followed Kentucky state precedent. In 1984, the Kentucky Court of Appeals affirmed summary judgment against a plaintiff who, though it had submitted the highest bid to purchase the city of Owensboro's public boat dock in order to move it to Louisville, lost the bidding to the second-highest bidder who promised not to remove the dock from Owensboro. *Ohio River Conversions, Inc. v. City of Owensboro, Ky.*, 663 S.W.2d 759 (Ky. Ct. App. 1984). That court noted that "[a]lthough the procurement code provides in some four different sections most laudatory policies and purposes, it must be kept in mind that its primary function is to benefit the citizens, as

is the real purpose of government itself and the laws pertinent thereto." *Id.* at 760. In ruling that the plaintiff's case failed for lack of standing (as a non-resident of Owensboro), the court left undisturbed the longstanding legal theories that

> absent fraud or collusion, the courts will not interfere with power to accept or reject bids by a governmental agency. . . . In addition, municipalities have wide discretion in the exercise of acceptance or rejection, and where they reserve the right to reject, the courts will not disturb their actions based on a mere technicality, even if made unwisely or under mistake.

*Id.* at 761.[5] In 1983, the Kentucky Court of Appeals ruled that a municipality (the city of Louisville) that had awarded a sewer construction contract to the lowest bidder could not be challenged despite that bidder's failure to submit a sufficient bid bond. *Shannon H. Holloway Constr. Co., Inc. v. Louisville & Jefferson County Metro. Sewer Dist.*, 674 S.W.2d 538 (Ky. Ct. App. 1983). These Kentucky cases demonstrate that the state has delegated broad discretion to its municipalities in the procurement process. Moreover, Boone County's own ordinances do not by their plain language restrict the county's discretion in awarding contracts, and the language of the bidding documents expressly provided for the county's discretion in selecting the winning bids. Therefore, the county has been afforded sufficient discretion to approve a bid despite its purported lack of adequate security, and so the plaintiff here cannot demonstrate that the county abused its discretion in awarding the contract to DSM.[6] We affirm the district court's grant of summary judgment on the § 1983 claim.

### III

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment.

---

[5] That court's reference to collusion or fraud left open the possibility that Kentucky courts might review procurement contracts where plaintiffs had sufficiently alleged that public officials themselves had acted in a corrupt manner. To analogize to the laws of agency, corporate governance, and sovereign immunity, there is a vital distinction to be made between an allegation that a public entity acted in some improper manner, and an allegation that public officials acted in a corrupt manner, and therefore *ultra vires*, in directing the actions of the public entity. In our case, EMI is not suing BCFC officials in their personal capacities for corrupt acts, nor has it alleged that BCFC officials acted in a personally corrupt manner when they awarded the masonry contract bids to DSM aside from a single allegation that one official should have recused himself from voting on the bids because of his conflict of interest with respect to a project that was tangentially related at best to the masonry contracts at issue here. Rather, EMI restricts its allegations of wrongdoing to the county's act, not to any *ultra vires* acts of its officials. For that reason, the allegations in this case do not qualify for the exception cited above.

[6] Our holding is bolstered by the fact that Kentucky law expressly restricts standing in public procurement cases to local taxpayers and citizens. *HealthAmerica Corp. of Ky. v. Humana Health Plan*, 697 S.W.2d 946, 948 (Ky. 1985). Such standing was left undisturbed by the Kentucky Supreme Court's ruling in *Pendleton Bros.* in jurisdictions that have not adopted the KMPC. In this case, plaintiff EMI is neither a taxpayer nor a resident of Boone County, and Boone County did not adopt the KMPC. Therefore, EMI would not have had standing under Kentucky law to challenge the BCFC's award of the bids to DSM, and so the company could not have reasonably expected to enjoy any property interest in the lost bids.