MERRITT, J., delivered the opinion of the court in which DAUGHTREY, J., joined. GRIFFIN, J. (pp. 945-53), delivered a separate dissenting opinion.
OPINION
MERRITT, Circuit Judge.
Section 1 of the Sherman Act broadly prohibits “combinations in restraint of trade.”[1] Plaintiff claims that defendants conspired to deny it access to managed care contracts that plaintiff needed to compete in the hospital market in Dayton, Ohio. The question in this case is whether defendants, four previously independent hospitals now operating as a hospital “network” under the name “Premier Health Partners,” is a “combination” subject to liability under § 1 of the Sherman Act, or whether it should be characterized as a single entity competing in the marketplace for hospital services in the Dayton area. The four hospitals entered into a joint operating agreement that merged[2] some of their healthcare functions, but retained control of others, and they continued to compete with each other. The district court held that the Premier group was a single entity and dismissed this antitrust case on summary judgment without adjudicating the question of whether the behavior of the Premier group of hospitals constitutes impermissible anticompetitive conduct. We disagree and reverse and remand for further proceedings under the Sherman Act.
I. Background
Plaintiff, The Medical Center at Elizabeth Place, opened in 2006 and operates a 26-bed, for-profit, physician-owned hospital in Dayton, Ohio.[3] Plaintiff specializes in acute-care surgical services. Its competitors for surgical patients in the Dayton market include the defendant hospitals. Defendant Premier Health Partners was formed in 1995 when two Dayton-area hospitals entered into a joint operating agreement. Over the next 13 years, several additional hospital corporations in the area entered into Premier’s joint operating agreement.[4] Premier Health Partners, *937 through the joint operating agreement, operates four hospitals: Good Samaritan Hospital, Miami Valley Hospital, Atrium Medical Center, and Upper. Valley Medical Center. See Second Amended and Restated Joint Operating Agreement of Premier Health Partners (executed Feb. 2008). Premier is not a hospital, does not provide any health care itself, and has no assets of its own. Instead, Premier handles much of the financial business of the hospitals through the joint operating agreement, including negotiating managed-care contracts with insurance carriers. The defendant hospitals share revenues and losses through an agreed-upon formula set forth in the joint operating agreement, but each defendant maintains separate ownership of its assets. Defendant hospitals file separate tax returns and other corporate forms and documents filed with-the government.
Plaintiff claims that the hospital defendants are not a single entity, but instead a group of hospitals capable of concerted action to keep plaintiff from competing in the market. Plaintiff offers proof that the group engaged in concerted action in three principal ways: (1) to coerce commercial health insurers that collectively represent at least 70% of the insured consumers in Dayton to refuse to negotiate contracts for managed care with plaintiff and to otherwise deny it access to their networks, thereby depriving plaintiff of the ability to serve a large segment of the Dayton consumer market; (2) by threatening .punitive financial consequences to physicians who affiliated with plaintiff, including terminating leases that physicians had with defendant hospitals for office space or terminating or evicting physicians already leasing from defendant facilities, and threatening to withhold referrals; and (3) by compelling physicians, either through threats of punitive measures or through financial incentives, to refuse to admit their patients to plaintiff hospital.
The question cannot be answered in the abstract as to whether a joint venture like the one here constitutes a single entity incapable of conspiring with' itself in an anticompetitive manner, or whether, instead, it becomes a vehicle to facilitate separate entities to conspire illegally to restrain trade. In American Needle, Inc. v. National Football League, 560 U.S. 183, 203 n. 10, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010), the Supreme Court relied on Justice Brandeis’s multi-factored test in Board of Trade of Chicago v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918), to determine whether a joint venture constitutes- a “combination” under Section 1:
The true test of legality is whether the restraint imposed is such as.merely regulates and- perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is appliedits condition before and after the restraint is imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy,- the.purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
(Emphasis added.)[5] The summary judgment record leaves little doubt on the *938 question of the intent of the network to prevent plaintiff hospital from entering the Dayton healthcare market. The deposition of the eventual head of plaintiff hospital contains the following testimony about a phone conversation he had with Thomas Arquilla, Executive Vice President of the Premier group of hospitals, one afternoon before the plaintiff hospital opened:
The conversation started with him asking me the question, John, I understand that you are, an investor.in. this new Regent ...Hospital [plaintiff hospital]. And I said yes, Tom, that’s true. I also understand that you are the chairman of the board of the hospital. Is that true? I said yes, it’s true. He said I want you to know that you are the enemy and that this is war, and you .are not going to open this hospital. I replied to him are you going to kick me off -of staff at Miami Valley Hospital? And he said John, I’m not going to tell you what we are going to do to you, but there are many things that we can do to you, and we are going to do them. I said Tom, are you going to blow -the facility up? And he laughed, and he said I already told you, J’ohn, there’s lots of things that we can do to you, and we are going to do them. You are not going to open this hospital. He then went on to say that our facility would suck .off good paying patients, that we were going to be cherry pickers, and that we would suck off good patients.
Fleishman Dep. at 118:12-119:10 (Oct. 22, 2013).
American Needle sets out the framework we are to follow in deciding the “single entity” versus “concerted activity” question at issue in this appeal. -Based on defendants’ stated intent to keep plaintiff out of the Dayton market, the evidence of coercive conduct threatening both physicians and insurance companies with financial loss if they did business with plaintiff, evidence of continued actual and self-proclaimed competition among the defendant hospitals, and evidence that the defendant hospitals’ business operations are not entirely unitary, we conclude that there is a genuine issue of material fact as to whether the defendant hospitals’ network constitutes-a single entity, or-concerted action among competitors for purposes of Section 1 of the Sherman Act.
II. Analysis
The Sherman Antitrust Act is based on an often-difficult distinction between concerted and independent, unilateral action. Concerted activity is scruti *939 nized more closely than unilateral behavior because “ ‘[concerted activity inherently is fraught with anticompetitive risk’ insofar as it ‘deprives the marketplace of independent centers of decisionmaking that competition assumes and demands.’” Am. Needle, 560 U.S. at 190, 130 S.Ct. 2201 (quoting Copperweld Corp. v. Indep, Tube Corp., 467 U.S. 752, 768-69, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). Specifically, Section 1 regulates concerted activity between two or more entities, outlawing- “[e]very contract, combination ... or conspiracy, in restraint of trade,” 15 U.S.C. § 1, a provision that has subsequently been limited to target only “unreasonable” restraints of trade. To prevail on a claim under § 1, a plaintiff must prove; (1) a contract, combination, or conspiracy; (2) producing adverse, anticompetitive effects in the relevant market; and (3) resulting in injury. See Expert Masonry, Inc. v. Boone Cty., Ky., 440 F.3d 336, 342 (6th Cir.2006). This appeal looks only at the element addressed by the district court, which is the first element: whether defendants’ conduct is the result of two or more entities acting in concert or whether defendants, based on their participation in the joint operating agreement, function as a single entity in the market place. Our analysis is guided by American Needle, which sets out the standard to apply in distinguishing concerted from unilateral action.
In American Needle, the Court looked at the conduct of members of an incorporated joint venture that organized the 32 NFL teams for purposes of marketing the NFL trademark for apparel. American Needle explained that “concerted action under § 1 does not turn simply on whether the parties involved are legally distinct entities.” 560 U.S. at 191, 130 S.Ct. 2201. Rather, “substance, not form, should determine whether a[n] ,.. entity is capable of conspiring under § 1.” Id. at 195, 130 S.Ct. 2201 (quoting Copperweld, 467 U.S. at 773 n. 21, 104 S.Ct. 2731). It is not dispositive that defendants organize themselves “under a single umbrella or into a structured joint venture,” id. at 196, 130 S.Ct. 2201, as defendant hospitals did here. The “key,” according to the Court, is whether the “contract, combination ..., or conspiracy” joins together “independent centers of decisionmaking.... If it does, the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one.” Id. (citation omitted). The Court went on to hold that the 32 teams “remain separately controlled, potential competitors with economic interests that are distinct from [National Football League Properties’] financial well-being.” Id. at 201, 130 S.Ct. 2201 (citing Herbert Hovenkamp, Exclusive Joint Ventures and Antitrust Policy, 1995 Colum. Bus. L.R. 1, 52-61 (1995)). Given this explanation, the Court in American Needle concluded that the joint venture formed by 32 NFL teams, “at least” with regard to their decision collectively to license the teams’ independently owned intellectual property, was engaged in concerted rather than single-entity action and thus potentially violated Section 1. The Court reasoned that apart from the teams’ agreement to cooperate in exploiting these assets, they would be competitors in the market to produce and sell team-logo apparel and headgear by licensing their intellectual property and dealing with suppliers.
Applying American Needle to examine the relationship among the defendant hospitals pursuant to the joint operating agreement, we come to the same conclusion. Like the joint venture in American Needle, the joint operating agreement brings together “independent centers of decisionmaking” that “remain separately controlled, potential competitors with eco *940 nomic interests that are distinct” and thus are capable of concerted action. See Nathaniel Grow, American Needle and the Future of the Single Entity Defense under Section One of the Sherman Act, 48 Am. Bus. L.J. 449, 484 (Fall 2011) (“[W]henever the entity is controlled by, or itself controls, competing economic actors, it is engaged in concerted activity rendering single entity status improper.”); see also Areeda & Hovenkamp, Antitrust Law f 1478a (2010) (The “most significant competitive threats arise when joint venture participants are actual or potential competitors.”).
The Supreme Court looks beyond labels to recognize underlying collusion among competitors as violations of the' Sherman Act. See Am. Needle, 560 U.S. at 191, 130 S.Ct. 2201 (“[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors' and served, in essence, as a vehicle for ongoing concerted activity.”); accord Timken Roller Bearing Co. v. United States, 341 U.S. 593, 594-95, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) (failing to “find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labeling the project a ‘joint venture’ ”), overruled on other grounds by Copperweld, 467 U.S. at 764-65, 104 S.Ct. 2731; United States v. Am. Tobacco Co., 221 U.S. 106, 187, 31 S.Ct. 632, 55 L.Ed. 663 (1911) (where the trust or holding company device brought together previously independent firms to lessen competition and achieve monopoly power, “the combination was in and of itself’ is a restraint of trade); see also Federal Trade Comm’n & U.S. Dep’t of Justice, Antitrust Guidelines for Collaborations Among Competitors 9 (2000) (“[L]a-beling an arrangement a ‘joint' venture’ will not protect what is merely a device to raise price or restrict output_”).
American Needle directs us to look at a number of factors when determining whether multiple parties joined together in a joint venture are functioning as a single entity for purposes of Section 1 of the Sherman Act. We first look to the actual conduct of the parties to the joint venture: “We have long held that concerted activity does not turn simply on whether the parties involved are legally distinct- entities. Instead, we have eschewed formalistic distinctions in favor of a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate.” 560 U.S. at 191, 130 S.Ct. 2201 (emphasis added). The Court went on to say that in looking at how the parties actually operate, “we have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity.” Id. (citing United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967) (holding that Sealy was not a single entity, but instead an “instrumentality of the individual” parties)).
The stated intent on the part of the defendants to engage in coercive behavior, as well as conduct providing evidence of that intent, is demonstrated by the conversation recited above between the CEO of plaintiff and the Executive Vice President of Premier, in which the Premier official stated his intention to keep plaintiff from entering the Dayton healthcare market. The record also contains evidence, through letters and emails, that physicians who collaborated with plaintiff in any way lost their leases for office space in properties owned by defendants and were threatened with loss of treating privileges at defendant hospitals.
*941 Boycott by Health Insurance Companies
■Another example of alleged conduct indicating possible anticompetitive intent on the part of defendants arises from evidence that insurance companies were refusing to deal with plaintiff at the behest of defendant hospitals. Defendant hospitals each executed separate managed-care contracts with each insurance company. Plaintiff offered evidence that defendant hospitals each individually executed managed-care contracts with the insurance companies that contained language prohibiting the insurer from also contracting with plaintiff by including an explicit restriction on the insurer’s ability to add a new hospital to its network. See, e.g., Email dated Aug. 10, 2009, from Mark Shaw of Premier to Renee Johnson of Premier with subject line referencing “Medical Center at Elizabeth Place” and requesting that Ms. Johnson investigate whether certain insurance companies were violating their contracts with Premier by adding new hospitals to their networks. Access to managed-care contracts offered by insurers is crucial to a hospital’s financial success.' The managed-care contracts with insurers provide the . hospital with the volume (patients who are covered by the insurers) that is necessary to survive. If a hospital cannot contract with a number of insurers, or at least several insurers with large numbers of insureds, it is unlikely to admit enough patients, and it is only through patients that the hospital generates revenue. Hospitals generally seek to become, “in-network” or “preferred” providers for a number of insurers, often accepting lower rates from the insurance companies in exchange for a higher volume of patients. In this case, the forming of the joint venture, bringing the defendant hospitals under the umbrella of Premier Health Partners, facilitated negotiation with insurers for managed-care contracts. The Federal Trade Commission and the Antitrust Division of the Justice Department recognize that “collaboration that eliminates or reduces price competition or allows providers to gain increased bargaining leverage with [insurers] raises significant antitrust concerns.” Deborah L. Feinstein, Director, Bureau of Competition, Federal Trade Commission, Antitrust • Enforcement in Health Care: Proscription, not Prescription, at 2, Address at the Fifth National Accountable Care Organization Summit (June 19, 2014). In this address, Director Feinstein also noted that “management contracts whereby one hospital manages another hospital with which it also competes may raise concerns similar to horizontal acquisitions.” Id. at 9.
Negotiating contracts that explicitly exclude the insurers’ ability to contract with other parties is anticompetitive on its face and normally serves no proper business function, a fact recognized by the district court in its first order denying the motion to dismiss. The Med. Ctr. at Elizabeth Place v. Premier Health Partners, 2012 WL 3776444, at,*5 (S.D.Ohio Aug. 30, 2012) (“Organizing a group boycott of [plaintiff] does not promote any legitimate objective of the [joint operating agreement] or achieve any procompetitive benefits.”). Plaintiff has submitted evidence that each insurer knew that the other insurers had included this limitation in their contracts, as demonstrated by the excerpt below from a Dayton industry publication:
■ Premier has threatened to revoke privileges for physicians participating in [plaintiff hospital] and contracts with health plans, such as Anthem and Uni-tedHealth are known to be contingent on excluding [plaintiff hospital] from the network.
HealthLeaders InterStudy, Dayton Market Overview at 7-8 (Apr. 2008). In addition to this published account, plaintiff also *942 offered evidence from insurance company-emails and defendant hospitals’ Board of Directors meetings, that, in addition to demonstrating knowledge among the insurers of the restriction on adding new hospitals to their networks in their managed-care contracts with defendant hospitals, the insurance companies regularly monitored each other to ensure that the other insurance companies were complying with the contract restriction on dealing with a new hospital.
The Joint Operating Agreement
American Needle also looked to other factors in addition to actual conduct, examining the nature of the business relationship among defendants, focusing on whether that relationship remains that of separate, competing entities or whether there is a single center of decisionmaking. As noted above, Premier owns no assets and it does not provide any healthcare services. Like the joint venture under scrutiny in American Needle, Premier is a separate corporate entity with its • own management structure, including a CEO and a Board of Directors, some of whom are employees of the individual defendant hospitals'. The joint operating agreement provides for certain management functions to be carried out by Premier on behalf of the defendant hospitals. Premier’s duties under the joint operating agreement are a'n attempt to achieve efficiencies in billing and collecting payments, managing physicians and physician groups, property management and other similar duties. American Needle emphasized that it is not dispositive that the parties to the joint venture ■ have' organized and 'created a legally separate entity that centralizes certain management functions. The Court stated that an “ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label. ‘Perhaps every agreement and combination in restraint of trade could be so labeled.’ ” Am. Needle, 660 U.S. at 197, 130 S.Ct. 2201 (quoting Timken Roller Bearing, 341 U.S. at 598, 71 S.Ct. 971). The joint operating agreement provides for some degree of unitary management, but questions remain as to whether “their general corporate actions are guided or determined by separate corporate consciousnesses.” Id. at 196, 130 S.Ct. 2201 (quotation marks and citations omitted).
The Premier joint operating agreement also provides for sharing revenue pursuant to an agreed upon formula. But, if the • fact that potential competitors shared in profits or losses from a venture meant that the venture was immune from § 1, then any cartel “could evade the antitrust laws simply by creating a ‘joint venture’ to serve as the exclusive seller of their competing products.” Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 335 (2d Cir.2008) (Sotomayor, J., concurring in judgment). Indeed, a joint venture with a single management.struct ture is generally a better way to operate a cartel because it decreases the. risk that a party to an illegal agreement will defect from that agreement. But, competitors “cannot simply get around” antitrust liability by acting “through a third-party intermediary or joint venture.” Am Needle, 560 U.S. at 201, 130 S.Ct., 2201 (internal quotations omitted).
Although joining together to- carry out certain functions, defendant hospitals remain separate legal entities, each with their own assets, filing their own tax returns and maintaining a separate corporate identity with its own CEO and Board of Directors. The record also demonstrates that defendant hospitals compete with each other for physicians and patients, with each defendant hospital continuing to market certain hospital services to the public. Each of the defendant hos- *943 pitáis makes material independent decisions concerning their respective medical operations that are not managed by Premier, including staffing decisions and medical strategies concerning patient care.
Like the NFL teams in American Needle, each defendant hospital holds its own assets. Thus, the defendant hospitals only “partially” unite their economic interests, and they continue to have distinct, potentially competing interests..- See Am. Needle, 560 U.S. at 198, 130 S.Ct. 2201. Any joint venture involves multiple sources of economic power cooperating to produce a product or provide a service. The benefits of cooperation do not transform concerted action into unilateral action that puts the joint venture beyond the reach of § 1. As the Court noted, “Apart from their agreement to cooperate in exploiting those assets, ... there would be nothing to prevent each of those teams from making its own market decisions.Id. at 200, 130 S.Ct. 2201. Here, the defendant hospitals clearly did not completely align their interests, economic of otherwise. The defendant hospitals continue to function more or less as independent and competing hospitals that entered into the joint operating agreement largely to derive the benefit of conforming certain business practices to a uniform standard. The evidence shows that the joint venture under Premier’s management is composed of individual hospitals that are separately incorporated, hold their assets separately, and compete with each other for patients. Like the NFL teams, each defendant hospital “is a substantial, independently owned”- business that is “guided [by a] ‘separate corporate consciousness[ ].’” Id. at 196, 130 S.Ct. 2201 (quoting Copperweld, 467 U.S. at 771, 104 S.Ct. 2731).
Defendant Hospitals Continue to Compete
The record also provides evidence that defendant hospitals continue to view themselves not as a single entity, but as competitors in the market. Defendants made statements to the public, among themselves and to a consultant hired by Premier, that demonstrate that they view themselves as separate entities. In 2010, Premier retained H*Works Consulting to help it devise a strategic five-year plan (2010-2015). One aspect of the study was to analyze the role of Premier and its relationship to its constituent elements, the defendant hospitals. As part of the process, 44 of defendants’ “executives- and key stakeholders” were interviewed by H*Works on a number of topics, including the integration of defendant hospitals. Pearce Fleming of H*Works conducted all of the interviews of defendants’ executives, including Premier’s Board of Trustees, the top level executives at Premier, and senior management from all the defendant hospitals. Fleming took contemporaneous notes of each interview, generating 11 sets of handwritten notes.
Based on these statements by defendants’ top administrators, H*Works made a number of findings, including the following: “[Premier] partners do not collaborate or act as a system today, more often [Premier] partners find themselves competing with each other;” “[Premier] does not have an' identity as a collaborative group, rather act as a confederacy that collaborates in a few areas (i.e., supplies, financing/access to capital, electronic medical records);” “[Premier] does not think of itself as integrated organization;” and “[Premier] Partners compete with each other for market share.” H*Works Consulting, Key Interview Findings, at 8 (Apr. 2010). Specific statements from the' interviews include: Premier is a “confederation of autonomous organizations” that cooperate in certain areas; “[t]he brand is the hospital, not [Premier];” defendant hospi- *944 tais “do their own thing and act in then-own self interest above that of [Premier];” and the joint venture structure was “designed to keep everyone separate.” H*Works Consulting Interview Statements at 2-5 (Apr. 2010). The FPWorks findings and interview statements set forth in its reports to Premier provide evidence that defendant hospitals uniformly agree that the they are driven to pursue individual hospital goals even after entering into the joint venture.
The district court refused to consider most of this compelling evidence, labeling it inadmissible hearsay. . In refusing to consider the findings from H*Works, the district court found the statements “incomplete, anonymous personal opinions.... lack[ing] any context,” ruling them “inadmissible, anonymous hearsay and speculation .”. The Med. Ctr. at Elizabeth Place v. Premier Health Partners, 2014 WL 7739356, at *4 (S.D.Ohio Oct. 20, 2014). To the contrary, many of the statements were attributable to a particular person. But, whether a specific identity is given or not, it was error to exclude these statements as they are admissions of a party-opponent, admissible under the hearsay exception in Federal Rule of Evidence 801(d)(2).[6] An anonymous statement may be admissible under Rule 801(d)(2) in certain circumstances that demonstrate sufficient indicia of reliability as to the authenticity of the statement. Davis v. Mobil Oil Expl. & Prod. Se., Inc., 864 F.2d 1171, 1174 (5th Cir.1989) (holding that anonymous statement was admissible as a statement by a party’s agent under Rule 801(d)(2)(D), and noting that “a district court should be presented with sufficient evidence to conclude that the person who is alleged to have made the damaging statement is in fact a party or an agent of that party_”).
The ’ statements fall within the hearsay exception for admissions of party opponents under Rule 801(d)(2)(D) because the district court was presented with “sufficient evidence” to conclude that the person who made the statement is in fact “a party or an agent” of defendants. It is undisputed that the speakers, though some are unidentified by name or specific title, were all executives or “key” stakeholders of defendant hospitals. The statements were made in the scope of their employment relationship and during the existence of the joint venture. They acted within the scope of them, employment in stating their views on the state of their, operations and integration of those operations at the request of .Premier’s CEO. Thus, the sources of the statements are identified sufficiently to establish that they were made by agents of defendants acting within the scope of and during the existence of their employment relationship. See Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d Cir.1997) (holding in a similar situation that statements from unidentified ex *945 ecutives were admissible because evidence established that though their precise identity was unknown, they were all “Westinghouse executives who had authority to make personnel decisions [and thus were] actfing] within the scope of their employment in stating their views on the state of their workforce_”). The crucial question is whether there is evidence that the unidentified declarants were speaking on a matter within the scope of their employment, not their identity. Back v. Nestle USA, Inc., 694 F.3d 671, 578 (6th Cir.2012).
III. Conclusion
The gravamen of plaintiffs complaint is that in creating a joint venture, defendants colluded to keep plaintiff from competing in the Dayton hospital market through a number of avenues. The evidence of emails, letters, and the statements elicited by the consultant, together with the lack of shared assets by the defendants, raises a genuine issue of material fact as to whether defendant hospitals have “separate” corporate consciences or whether they should be considered a single entity for purposes of the antitrust laws. All of these facts suggest that defendant hospitals are actually competitors attempting to eliminate another competitor through concerted action. When viewing the record in the light most favorable to plaintiff, a reasonable juror might conclude that, aside from a business relationship pursuant to the joint operating agreement, defendant hospitals maintained separate identities and acted more like competitors than one unit. Expert Masonry, Inc. v. Boone Cty., Ky., 440 F.3d 336, 341 (6th Cir.2006) (“In this circuit, courts are generally reluctant to use summary judgment dispositions in antitrust actions due to the critical ‘role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference.’ ”)(qaoting Smith v. N. Mich. Hosp., Inc., 703 F.2d 942, 947 (6th Cir.1983)).
Because plaintiff presented evidence of conduct and business operations that raise the possibility of concerted action among defendant hospitals, the question remains upon remand whether hospitals that had previously pursued their own interests separately, and that continue to seem to compete, combined unlawfully to restrain competition.
For the foregoing reasons, the judgment of'the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

. Section 1 of the Sherman Act prohibits any “contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations.” 15 U.S.C. § 1.

. A merger was not possible because one of the hospitals, Catholic Health Initiatives, Inc., was prohibited from joining a non-Catholic entity.

. In 2009, after struggling financially for three years, which plaintiff claims resulted from defendants' illegal boycott, plaintiff sold a 49% ownership interest to Kettering Health Network, a major competitor of defendant Premier Health Partners in the Dayton market. The sale allowed plaintiff to gain access to Kettering’s managed-care contracts with local insurance companies and thereby increase its patient volume.

.The corporate defendants, in addition to Premier Health Partners, are Atrium Health System, Catholic Health Initiatives, MedAm- *937 erica Health Systems Corporation, Samaritan Health Partners, and UVMC.

. Our dissenting colleague does not agree that this statement from Justice Brandéis in Amer- *938 ■icon Needle is relevant because it discusses facts relating to defendants’ intent, history . and coercive behavior. The. objection is strange because Justice Brandeis’s admonition is quoted at length in a case where the issue was whether the defendant was a single entity. ■ Surely if the Supreme Court had thought that Justice Brandeis’s factors concerning conduct and intent were irrelevant, it would not have said they were relevant and directed lower courts to consider them. We - .understand -that, at least -on paper, the joint venture agreement, written by defendants themselves, aims to legitimate the cartel. But further factual determination is required to resolve whether the neutral words of the agreement belie the true aim of defendants’ association. We are tasked with looking at the evidence before us, which includes evidence of defendants’ unveiled threats to plaintiff and the words of defendants’ employees and agents concerning their views on the nature of the' relationship among defendants. See Freeman v. San Diego Ass’n of Realtors, 322 F.3d 1133, 1150 (9th Cir.2003) (“Defendants sabotage their theory by their own admissions./.. Rarely do antitrust defendants serve up their own heads on so shiny a silver platter."). Our. colleague's refusal to consider anything other than the joint venture agreement is tantamount to repealing Section 1 of the Sherman Act by allowing the cartel members themselves to write up the only facts to be considered.

. The Rule states in relevant part:
(d) Statements That Are Not Hearsay. A statement that meets the following conditions is not hearsay:
[[Image here]]
(2) An Opposing Party's Statement. The statement is offered against an opposing party and:
(a) was made by the party in an individual or representative capacity;
(B)is one the party manifested that it adopted or believed to be true;
(C) was made by a person whom the party authorized to make a statement on the subject;
(D) was made by the party’s agent or employee on a matter within the scope of that relationship and while it existed; or
(E) was made by the party's coconspirator during and in furtherance of the conspiracy