RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0078p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

THE MEDICAL CENTER AT ELIZABETH PLACE, LLC,
                              *Plaintiff-Appellant*,

        *v.*

                                                        No. 17-3863

ATRIUM HEALTH SYSTEM, et al.,
                              *Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:12-cv-00026—Walter H. Rice, District Judge.

Argued:  April 25, 2018

Decided and Filed:  April 25, 2019

Before:  BATCHELDER, SUTTON, and WHITE, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Richard A. Ripley, RUYAK CHERIAN LLP, Washington, D.C., for Appellant. Shay Dvoretzky, JONES DAY, Washington, D.C., for Appellees.  **ON BRIEF:**  Richard A. Ripley, Brittany V. Ruyak, RUYAK CHERIAN LLP, Washington, D.C., James A. Dyer, Patrick O'Shaughnessy, SEBALY, SHILLITO + DYER, Dayton, Ohio, for Appellant.  Shay Dvoretzky, Robert Stander, JONES DAY, Washington, D.C., Melinda K. Burton, FARUKI IRELAND COX RHINEHART & DUSING P.L.L., Dayton, Ohio, Thomas Demitrack, JONES DAY, Cleveland, Ohio, for Appellees.

        BATCHELDER, J., delivered the opinion of the court in which SUTTON, J., joined, and WHITE J., joined in part.  SUTTON, J. (pp. 24–26), delivered a separate concurring opinion. WHITE, J. (pp. 27–30), delivered a separate opinion dissenting in part.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   This is a case about competition among hospitals in Dayton, Ohio.  When Medical Center at Elizabeth Place, LLC ("MCEP") opened in 2006, it was an acute care, for-profit hospital owned by 60 physicians and one corporate shareholder.  By 2009, MCEP's existence as a physician-owned enterprise came to an end when it sold an ownership interest to Kettering Health Network, a competitor in the Dayton healthcare market.  MCEP alleges that it failed because of the anticompetitive actions of Premier Health Partners ("Premier"), a dominant healthcare network in the Dayton area.  MCEP alleges that Premier contracted with area physicians and payers (insurers and managed-care plan providers) on the condition that they did not do business with MCEP.  Because payers provide patients and physicians provide services, it is difficult to run a viable hospital when one, let alone both, is in short supply.

So, whether by licit or illicit means, Premier won that competition.  In this litigation, the parties competed again.  This time, MCEP pushed all its chips to the center of the table on one hand of cards: a claim that Premier had engaged in conduct so devoid of benefit to the market as to be per se illegal under the Sherman Act.  Such claims apply only to a limited range of conduct.  To be per se illegal, a defendant's conduct has to be so obviously anticompetitive that it has no plausibly procompetitive features—a high hurdle for plaintiffs claiming restraint of trade.  Once they clear it, however, plaintiffs receive a corresponding reward: they need not undergo the often arduous process of showing that the challenged conduct was anticompetitive.  As one of our sister circuits has described it, "[t]he per se rule is the trump card of antitrust law.  When an antitrust plaintiff successfully plays it, he need only tally his score."  *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362-63 (5th Cir. 1980).[1]

---

[1]The other approach to determining whether a restraint of trade is "unreasonable" is the "rule of reason." *In re Southeastern Milk Antitrust Litigation*, 739 F.3d 262, 270 (6th Cir. 2014).  "If the rule of reason is used, plaintiffs must additionally show that the restraint produced anticompetitive effects within the relevant product and geographic markets, while the per se rule is reserved for restraints that are so clearly unreasonable that their anticompetitive effects within geographic and product markets are inferred." *Id.*

The question before us is whether MCEP successfully played its hand.  The district court from which MCEP appeals found that MCEP's per se claim failed because the record showed that Premier's contracts with payers and physicians had plausibly procompetitive features.  That holding says nothing about whether Premier's conduct was on balance procompetitive or anticompetitive.  This opinion likewise reaches no decision on the ultimate economic merits of Premier's actions because to do so would go beyond our charge.  We must address only the question of per se illegality, and as to that, we agree with the district court that MCEP failed to meet the high standard required for per se claims.  We **AFFIRM**.

**I.**

MCEP alleges a conspiracy between the Premier hospitals that implicates, without naming as defendants, payers and physicians in the Dayton area.  During the course of this multi-year litigation, various legal issues raised in this case have been ruled on by U.S. District Judge Black, a Sixth Circuit appellate panel, and then, after the matter was remanded and Judge Black recused himself, District Judge Rice, who granted the motion for summary judgment presently before us.

Factual Background

MCEP is an acute-care hospital located in Dayton, Ohio, that opened in September 2006 with 60 physician owners and one corporate shareholder, Regent Surgical Health.  Defendants in this case comprise four hospitals—Miami Valley Hospital (owned by MedAmerica Health), Good Samaritan Hospital (owned by Catholic Health Initiatives), Atrium Medical Center (owned by Atrium Health Systems), and Upper Valley Medical Center—as well as a joint operating company, Premier Health Partners ("Premier"), formed through a joint operating agreement among those four hospitals.[2]  This joint operating agreement merged some of the hospitals' healthcare functions but allowed them to retain control of others.  *Med. Ctr. at Elizabeth Place v. Atrium Health Sys.* ("*MCEP I*"), 817 F.3d 934, 936-37 (6th Cir. 2016).  Hospital Defendants

---

[2]In this opinion, we refer to the four hospitals and the joint operating company collectively as "Hospital Defendants" except where otherwise noted.

comprise a dominant healthcare network in the Dayton area, with more than a 55% share of Dayton's inpatient surgical services.

In spite of its dominant market position, the record leaves no doubt that Hospital Defendants felt threatened by the possibility of MCEP's presence in the Dayton medical market. Five months before MCEP opened for business, Hospital Defendants held a board meeting at which, "[b]y consensus, the Board supported management's efforts" to oppose MCEP. Executives from Premier told an MCEP shareholder that Hospital Defendants "would do whatever they needed to do in order to stop [MCEP] from opening."

Hospital Defendants' underlying concern appears to have been that MCEP's for-profit, physician-owned model of healthcare would "bankrupt" their hospitals. A letter written by primary care physicians (most of whom were affiliated with Hospital Defendants), addressed to physicians in the Dayton healthcare market, expressed the dynamic they found worrisome:

> There is currently widespread opposition among not-for-profit community hospitals across the country toward physician owned inpatients [sic] hospitals such as this. The physician investors are doing so for reasons of profitability. MVH and GSH offer the range of services and the quality of care necessary to enable surgeons to care for their patients. A physician owned specialty hospital will take the better-insured and more profitable patients away from Premier (along with ancillary services), leaving our local hospitals with only the more complex and underinsured patients.

MCEP, for its part, wrote a "Dear Colleague" letter the next month, responding:

- While MCEP's business model will "create a competitive environment to deliver better and more efficient healthcare in Dayton," it will not drive hospitals out of business;

- MCEP "will not turn away patients on the basis of payor classification";

- "Premier generates about $1 billion in revenues and currently has a cash reserve of over $1 billion. As a non-profit, Premier pays no taxes. . . . [MCEP] will have revenues that are a fraction of Premier's, and our physician-owned hospital will pay corporate, personal and property taxes";

- "[C]omprehensive studies have confirmed that physician-run hospitals have fewer medical errors, shorter turnover times, fewer infections and greater cost efficiencies."

Citing Hospital Defendants' board-meeting consensus and their letter to physicians, MCEP alleges that Hospital Defendants blocked MCEP from gaining meaningful access to the Dayton market through a series of anticompetitive acts that amounted to a group boycott of MCEP. In its Amended Complaint, MCEP made only a per se claim; MCEP made no claim under the rule of reason. MCEP's Amended Complaint alleges that Hospital Defendants:

- financially coerced commercial health insurers or managed care plan providers (such as Anthem, UnitedHealthcare, Private Healthcare Systems, etc.) "to refuse to permit [MCEP] full access to their respective networks";

- financially coerced commercial health insurers or managed care plans to reimburse MCEP at suppressed rates far below what Hospital Defendants demanded for the same services;

- threatened retributive financial consequences to physicians who affiliated with MCEP, and followed through on threats, "including terminating leases that the physicians had with the Defendants for office space";

- offered payments to physicians "who agreed not to work with or at [MCEP]; and who agreed to divest ownership in the Medical Center";

- financially coerced physicians affiliated with Hospital Defendants from "admitting patients to [MCEP] or referring patients to physicians who treated patients at [MCEP]"; and

- deliberately poached physicians from MCEP who made up a "disproportionately high number of admissions and then prohibited them from admitting patients to [MCEP]."

Beyond these allegations, MCEP claims that, in the course of litigation, it discovered two additional agreements that comprised part of the actionable group boycott.[3] First, MCEP alleges an agreement among the payers, induced by Hospital Defendants, not to offer MCEP a managed care contract. Second, MCEP alleges an agreement among primary care physicians not to do business with physicians who invested in MCEP (Hospital Defendants refer to this as the "physician conspiracy"). Hospital Defendants describe the relationship of these agreements to the original allegation using the metaphor of a hub, spoke, and rim. For these claims, the Hospital Defendants form the hub; the vertical agreements the Hospital Defendants made with

---

[3]While there is some dispute about exactly when these claims were first brought to Hospital Defendants' attention, there does not appear to be any dispute that the claims were raised (though the Complaint was not amended to reflect the new claims) in MCEP's opposition to Hospital Defendants' initial motion for summary judgment before Judge Black.

payers and physicians to exclude MCEP are the spokes; and the discrete agreements to boycott MCEP, among the payers and among the physicians, are at the rim.

MCEP alleged only the "hub" agreement in its Amended Complaint. Hospital Defendants argue that the "rim conspiracy" claim is a new, *and untimely*, Sherman Act Section 1 claim. MCEP, for its part, maintains that the additional agreements are simply evidence of the overarching Section 1 conspiracy alleged in their Amended Complaint. Regardless of the exact scope of the alleged boycott, MCEP alleges that one existed, that it was orchestrated by Hospital Defendants, and that it prevented MCEP from succeeding as a going concern. MCEP claims that, but for Hospital Defendants' conduct, it would have been able to contract with payers and physicians, which would have, in turn, increased competition in the Dayton healthcare market for consumers of general inpatient surgical services.

Procedural History

This case was before Judge Black in Cincinnati from January 30, 2012, to April 19, 2017. During that time, Judge Black granted Hospital Defendants' motion for summary judgment on the ground that the MCEP's antitrust claim lacked the necessary plurality of actors.

On appeal to this court, a divided panel reversed Judge Black and rejected Hospital Defendants' motion for summary judgment. The panel held that a reasonable juror could find that Premier comprised multiple competing entities and, therefore, could engage in concerted action. *MCEP I*, 817 F.3d at 945. The panel did not address other issues raised before it, such as whether MCEP's additional rim conspiracy claims were untimely. *Id*. at 939.

On remand, Hospital Defendants moved again for summary judgment arguing, among other things, that MCEP's allegation of a per se antitrust violation failed as a matter of law. Hospital Defendants argued that their alleged restraints on trade were plausibly procompetitive which, they argued, is sufficient to defeat a per se antitrust claim. Because MCEP pleaded only a per se claim, if Hospital Defendants had succeeded in this argument, the case would have been dismissed. Judge Black denied Hospital Defendants' renewed motion for summary judgment, rejecting Hospital Defendants' argument on two alternative bases: *first*, the claimed procompetitive effects of the challenged conduct are subject to genuine dispute and are therefore

an improper basis for summary judgment, and *second*, Hospital Defendants "failed to evidence that their joint contracting has any efficiency-enhancing purpose to which such an agreement is necessary." *Med. Ctr. at Elizabeth Place v. Premier Health Partners*, 2016 WL 9460026, at *5 (S.D. Ohio Oct. 6, 2016).

The case was set for trial.  But on April 19, 2017, Judge Black recused himself and the case was re-assigned to Judge Rice.[4]  Before Judge Rice, Hospital Defendants moved to "Clarify Issues for Trial," which all parties now agree amounted to a motion for reconsideration of Judge Black's October 6, 2016, order denying Hospital Defendants' motion for summary judgment. Less than a week before trial was set to begin, Judge Rice granted Hospital Defendants' motion for summary judgment and dismissed the Amended Complaint with prejudice.  Judge Rice declined to apply the "law of the case" doctrine, holding that Judge Black had clearly erred.  He found that while Judge Black correctly articulated the standard for a per se claim—that the challenged conduct must have no plausible procompetitive effect—Judge Black failed to acknowledge that the record showed that the Hospital Defendants' challenged restraints had such plausible procompetitive effects.  Judge Rice also rejected MCEP's argument that the Amended Complaint implicitly included claims of rim conspiracies among the payers and among the physicians—claims that all agree, if proven, would constitute a per se violation—explaining that those claims were not contained in the Amended Complaint, that MCEP's attempt to "wedge this new claim into the existing allegations" was improper, and that the Hospital "Defendants would be severely prejudiced if MCEP were permitted to amend its Complaint [again] at this late date." MCEP asks us to reverse Judge Rice's decision granting Hospital Defendants' motion for summary judgment and to remand the case for trial.

## II.

Summary judgment is warranted if, viewing the facts in the light most favorable to the nonmoving party, no material fact is subject to a genuine dispute.  *Matsushita Elec. Indus. Co. v.*

---

[4]Judge Black explained that, as a "Cincinnati duty-stationed Judge," he could not preside over a trial in Dayton.

*Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).**5**  We review de novo grants of summary judgment.  *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 341 (6th Cir. 2006).

The parties dispute what de novo review should entail in this case.  MCEP claims that Judge Rice's decision to not apply the "law of the case" doctrine was critical to his decision to grant Hospital Defendants' motion for summary judgment, and therefore we must review Judge Rice's "law of the case" decision de novo.  According to MCEP, Judge Rice could reconsider Judge Black's denial of summary judgment only by finding that Judge Black clearly erred.  So, MCEP says, if Judge Rice was wrong that Judge Black committed clear error, then we must reverse his "law of the case" judgment.  For their part, Hospital Defendants argue that we should simply review de novo Judge Rice's substantive legal conclusions, separate and apart from Judge Rice's "law of the case" conclusion.

Ultimately, the Hospital Defendants have the better of this argument.  *First*, we review for abuse of discretion Judge Rice's decision to reconsider Judge Black's pre-transfer order.  *See United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990).  MCEP argues that abuse of discretion is not the proper standard of review in a case transferred from one district court to another, in which a pre-transfer ruling of one judge is altered by a post-transfer decision of a different judge.  We have foreclosed this argument by holding—in precisely the scenario identified by MCEP—that abuse of discretion remains the proper standard of review.  *See Gillig v. Advanced Cardiovascular Sys. Inc.*, 67 F.3d 586, 590 (6th Cir. 1995).**6**

---

**5**If a presumption against summary judgment in antitrust cases is ever appropriate, it is not here.  This circuit has applied a presumption against summary judgment in antitrust actions only when the case demanded a fact-intensive inquiry under the rule of reason into issues of intent and motive.  *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) (quoting *Expert Masonry, Inc. v. Boone Cty.*, 440 F.3d 336, 341 (6th Cir. 2006)); *but see In re ATM Antitrust Litigation*, 554 F. Supp. 2d 1003, 1010 (N. D. Cal. 2008) (opining that "any presumption against the granting of summary judgment in complex antitrust cases has now disappeared") (citation omitted).  Unlike in a rule of reason claim, in a per se claim intent and motive are not critical determinations.  *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1910a (3rd ed. 2011).

**6**MCEP cites *Jimkoski v. State Farm Mut. Auto. Ins. Co.*, 247 F. App'x 654 (6th Cir. 2007), for the proposition that Judge Rice's "law of the case" decision—specifically his finding that Judge Black committed clear error—should be reviewed de novo.  This misapplies *Jimkoski*. Read in context, *Jimkoski* simply acknowledged that where a motion for reconsideration concerns summary judgment, we do not review the district court's decision to grant summary judgment for abuse of discretion.  *Id*. at 659.  To do so would insulate the district court's merits decision from the proper standard of review—de novo—simply because the motion that the district court ruled on was a motion for reconsideration.  That concern is not present in this case because we review for abuse of discretion

*Second*, we can find that Judge Rice abused his discretion in disturbing Judge Black's denial of summary judgment only if we have a "definite and firm conviction that [Judge Rice] committed a clear error in judgment" such as "rel[ying] upon clearly erroneous factual findings, appl[ying] the law improperly, or us[ing] an erroneous legal standard." *See Garner v. Cuyahoga Cty. Juvenile Ct.*, 554 F.3d 624, 634 (6th Cir. 2009) (citation and quotation marks omitted). Of these potential bases for abuse of discretion, MCEP argues only that Judge Rice improperly applied the law, a question that we review de novo.

## III.

MCEP's raises two substantive claims on appeal. *First*, MCEP argues that the district court erred by declining to apply the per se rule to Hospital Defendants' allegedly anticompetitive conduct. *Second*, MCEP argues that the district court erred in rejecting MCEP's "horizontal rim claims" due to untimeliness. Neither argument has merit.

## A.

Per se claim

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. Because virtually every agreement between parties has the potential to be considered a restraint of trade, antitrust jurisprudence limits the range of restraints within the reach of antitrust law to agreements that *unreasonably* restrain trade. *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014). A restraint on trade may be found to be unreasonable per se or under the "rule of reason." *Id*. As MCEP makes only a per se claim, the question before us is whether Judge Rice erred in granting Hospital Defendants' motion for summary judgment on the grounds that Hospital Defendants' conduct falls outside per se illegality. Judges Black and Rice did not agree in their answer to the underlying question and the prior Sixth Circuit panel declined to address it. *MCEP*

---

the decision to grant a motion for reconsideration (here that means we review the "law of the case" decision for abuse of discretion). But we still review de novo the merits of the district court's grant of summary judgment.

*I*, 817 F.3d at 939 (explaining that "[t]his appeal looks only at . . . whether defendants' conduct is the result of two or more entities acting in concert").

Although a motion for summary judgment against a per se claim involves underlying facts, the propriety of per se treatment "is normally a question of legal characterization that can often be resolved by the judge on a motion . . . for summary judgment." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 61 (1st Cir. 2004). There is a presumption against applying the per se rule "[u]nless the restraint falls squarely into a *per se* category." *Southeastern Milk*, 739 F.3d at 271. As explained in *Expert Masonry*, "a *plaintiff* must satisfy each element of the *per se* . . . test[] . . . in its allegations in order to survive pre-trial termination." 440 F.3d at 344 (emphasis added). In *Southeastern Milk*, the court held that, even where a factual dispute exists between the parties over whether a challenged restraint is obviously anticompetitive—and therefore deserving of per se treatment—the defendants producing "evidence that the agreement at issue may have had procompetitive aspects . . . indicate[s] that this situation would not fall into the categories of *per se* unreasonable restraints on trade." 739 F.3d at 274. The court concluded that "[t]herefore, especially at the summary judgment stage, this is not a 'clear cut' case of an obviously anticompetitive trade restraint, and thus the district court was correct to apply the default standard of the rule of reason." *Id*. Hence, at the summary judgment phase, the right question to ask regarding per se claims is whether the plaintiff has shown that the challenged restraint is so obviously anticompetitive that it should be condemned as per se illegal. If, in spite of the plaintiff's efforts, the record indicates that the challenged restraint is plausibly procompetitive, then summary judgment for the defendants is appropriate.

Per se claims against joint ventures

The question before us is further delineated by the fact that the challenged restraints exist within a joint venture, which the Supreme Court has noted "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively." *Copperweld Corp v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984). At the same time, joint ventures often superficially resemble horizontal concerted action because they involve horizontal competitors joining together to restrain trade in some way, such as by coordinating prices. *See Texaco Inc. v. Dagher*, 547 U.S.

1, 4 (2006) (denying a per se horizontal price fixing claim brought by a plaintiff against a joint venture created by Texaco and Shell Oil that unified their respective gasoline refining and marketing operations in the western United States under two brands).

Because joint ventures often have procompetitive efficiencies, when a joint venture is itself challenged as anticompetitive, that claim is reviewed under the rule of reason. *Copperweld Corp.*, 467 U.S. at 768. But when the *conduct* of the joint venture is challenged, the relationship of the challenged conduct to the joint venture is analyzed to see if the conduct is reasonably related to the joint venture's procompetitive features (and therefore should be judged under the rule of reason), or is a naked restraint lurking beneath the veneer of a legitimate joint venture (and therefore deserves per se condemnation). *See Nat. Collegiate Athletic Assn. v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 113-15 (1984) (observing that a "naked" restraint, subject to the per se rule, can exist even though it is contained in a joint venture agreement that is, overall, quite competitive). The Supreme Court has distinguished three categories of restraints: (1) restraints that are <u>core</u> to the joint venture's efficiency enhancing purpose; (2) restraints that are <u>ancillary</u> to the joint venture's efficiency enhancing purpose; and (3) restraints that are <u>nakedly</u> unrelated to the purpose of the joint venture. *See Dagher*, 547 U.S. at 7-8. Only the last of these three justifies per se treatment. *Id*.

<u>Core activity</u>

Core activity is activity that is "integral to the running" of the venture. *Id*. at 7-8. In *Dagher*, the Supreme Court rejected a per se claim against horizontal price-setting by two competitors on the ground that the price-setting "involve[d] the core activity of the joint venture itself." *Id*. at 7.

Hospital Defendants claim that the challenged panel limitation—but not the other challenged restraints—qualifies as core activity. They argue that because *Dagher* described price setting as a core activity for the joint venture in that case, and because panel limitations are a "pricing term" in Hospital Defendants' contracts with payers, the panel limitations are "core activity."

This argument is not persuasive. *Dagher* does not stand for the general proposition that restraints in contracts that are price related are always core activity for joint ventures. *Dagher*'s holding was tailored to the specific joint venture before it. *Id.* at 5-6. This argument may be dismissed simply by noting that the definition of "core activity" provided by *Dagher*, "integral to the running" of the joint venture, *id.* at 7-8, cannot seriously be argued of Hospital Defendants' panel limitations. Hospital Defendants continue to operate as a joint venture today even though the panel limitation clauses have been removed from their contracts with payers.

Joint venture's ancillary restraints

Restraints that are "ancillary to the legitimate and competitive purposes of the business association" fall between "core" activity and "naked" restraints. *Id.* at 7. These are restraints by a joint venture that are not "integral to the running" of the joint venture, *id.* at 8, "but may contribute to the success of a cooperative venture." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). A restraint is ancillary if it bears a *reasonable* relationship to the joint venture's success. *See Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 339-40 (2d Cir. 2008) (Sotomayor, J., concurring).

Predictably, the parties spill considerable ink contesting what counts as "reasonable." MCEP urges the panel to accept Judge Black's version of the ancillary-restraints doctrine. We decline to do so because Judge Black framed the ancillary-restraints inquiry incorrectly in two ways: by applying too high a standard to determine what qualifies as "reasonable" and by placing an evidentiary burden on Hospital Defendants to meet that standard. Judge Black rejected Hospital Defendants' argument that their restraints bore a reasonable relationship to the joint venture's success, holding that they "failed to evidence that their joint contracting has any efficiency-enhancing purpose to which such an agreement is necessary." Under this standard, only restraints that are *necessary* to a joint venture's efficiency-enhancing purposes qualify as ancillary. Further, Judge Black held that Hospital Defendants must provide "undisputed proof" that the restraint is necessary to prevent a per se claim from proceeding to trial.

Judge Black's sole source of authority for this version of the ancillary-restraints doctrine is a guidance document put out by the Federal Trade Commission and the United States

Department of Justice on collaboration among competitors.  *See* Dep't of Justice & FTC, *Antitrust Guidelines for Collaborations Among Competitors* § 3.3, at 10-25 (Apr. 2000).  But the citation is of dubious relevance to the ancillary-restraints doctrine because the cited section deals with joint ventures only under the rule of reason, not the per se rule.

To bolster Judge Black's approach, MCEP cites *NaBanco v. Visa U.S.A., Inc.*, 779 F.2d 592, 601 (11th Cir. 1986), and *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 872 (N.D. Ill. 2010), for the proposition that an ancillary restraint must be *necessary* to achieve the joint venture's efficiency-enhancing purpose.  *NaBanco* supports MCEP's preferred formulation, but *In re Sulfuric Acid* does not.  *In re Sulfuric Acid* echoes the ancillary-restraints inquiry articulated by the Seventh Circuit in *Polk Brothers*: "A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.  If it *arguably* did, then the court must apply the Rule of Reason to make a more discriminating assessment."  743 F. Supp. 2d at 872 (quoting *Polk Bros.*, 776 F.2d at 189) (emphasis added).

Hospital Defendants, on the other hand, describe the standard as whether there exists a *plausible* procompetitive rationale for the restraint.[7]  The Second, Seventh, Eighth, and Ninth Circuits adopt this approach.[8]

Perhaps most destructive to MCEP's argument is then-Judge Sotomayor's concurrence in *MLB Properties*, 542 F.3d at 338.  Although MCEP cites that concurrence five times in its briefing, Judge Sotomayor categorically rejected the position MCEP asks this court to adopt. She described ancillary restraints as requiring "a *reasonable* procompetitive justification, related to the efficiency-enhancing purposes of the joint venture."  *Id.* at 339 (emphasis added).  Then, in

---

[7]Hospital Defendants, at one point, argue that the correct legal standard for determining whether a restraint is ancillary or naked is whether the challenged restraint is "completely unrelated to the purpose of a lawful joint venture."  But this mischaracterizes the ancillary-restraints doctrine.  "The per se rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the per se rule to the Rule of Reason category."  *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 595 (7th Cir. 1984).

[8]*See MLB Properties*, 542 F.3d at 338-39 (Sotomayor, J., concurring); *Craftsmen Limo,, Inc. v. Ford Motor Co.*, 363 F.3d 761, 776 (8th Cir. 2004) ("When determining whether to apply the rule of reason analysis to non-price advertising restrictions related to product safety, the issue is not whether the restrictions *were* procompetitive, but whether they *could be*."); *Paladin Assoc., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1154-55 (9th Cir. 2003) ("When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, per se treatment is inappropriate, and the rule of reason applies."); *Polk Bros.*, 776 F.2d at 189.

defining what qualifies as "reasonable," she expressly rejected the formulation that MCEP argues here: "Under the ancillary restraints doctrine, a challenged restraint need not be essential, but rather only reasonably ancillary to the legitimate cooperative aspects of the venture." *Id*. at 340 n.11 (citations and internal quotation marks omitted); *see also Polk Bros.*, 776 F.2d at 189 (explaining that a restraint is ancillary if it *may* promote the success of a joint venture).

The question of what relationship a challenged restraint must have to a joint venture in order to qualify as ancillary splits the Circuits—the Eleventh Circuit on the one hand, and the Second, Seventh, Eighth, and Ninth Circuits on the other. We follow the majority of Circuits and hold that a joint venture's restraint is ancillary and therefore inappropriate for per se categorization when, viewed at the time it was adopted, the restraint "may contribute to the success of a cooperative venture." *Polk Bros.*, 776 F.2d at 189. That approach better accords with Supreme Court guidance. As the Ninth Circuit in *Paladin Associates* explained:

> The Supreme Court generally has treated as per se illegal joint efforts by firms to disadvantage a competitor by persuading customers to deny that competitor relationships the competitor needs in the competitive struggle. But in these cases, the practices generally were not justified by plausible arguments that the practices enhanced overall efficiency and made markets more competitive.

328 F.3d at 1154-55. In a footnote that follows the court elaborated:

> This is so because plausible arguments that a practice is procompetitive make us unable to conclude "the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote."

*Id*. at 1155 n.8 (quoting *Stationers*, 472 U.S. at 294).

*Paladin* faithfully applies the Supreme Court's holding in *Stationers*. Condemning as per se illegal restraints that, while not necessary to achieving a joint venture's efficiency-enhancing purpose nevertheless plausibly relate to that purpose, would run counter to the Supreme Court's instruction to avoid applying the per se rule to situations where efficiencies are being served. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007) (holding that per se treatment is inappropriate where "it cannot be stated with any degree of confidence that [the challenged restraint] 'always or almost always tends to restrict competition and decrease

output'") (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988)).

MCEP's second but related argument, which was adopted by Judge Black, is that Hospital Defendants bear the burden of proving that a challenged restraint is procompetitive, and therefore ancillary, because the question of the procompetitiveness of a restraint is "quintessentially one of fact." Judge Black's inclination to defer to the fact finder has an intuitive appeal in the summary judgment context. And it would be correct had MCEP brought a claim under the rule of reason. *See Perceptron, Inc. v. Sensor Adaptive Mach., Inc.*, 221 F.3d 913, 919 (6th Cir. 2000) ("[T]he rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition.") (citation omitted). For a per se claim, however, Judge Black's conclusion is erroneous. Whether challenged conduct belongs in the per se category is a question of law. *See Ariz. v. Maricopa Cty. Med. Socy.*, 457 U.S. 332, 337 n.3, 354 (1982) (characterizing the per se rule as a "rule of law"); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 847 (5th Cir. 2015) ("The decision to analyze the conspiracy under a per se theory of liability is a question of law that we review de novo."). In *Craftsmen Limousine, Inc. v. Ford Motor Co.*, the Eighth Circuit likewise found that whether a given restraint falls within the per se category is a question of law, citing a well-respected treatise on antitrust law for the proposition that "although a court's determination that the per se rule applies 'might involve many fact questions, the selection of a mode of analysis is entirely a question of law.'" 363 F.3d 761, 772 (8th Cir. 2004) (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1909b (1998)). And it is a question of law where certain presumptions apply. As we explained in *Expert Masonry*, the "*plaintiff* must satisfy each element of the per se . . . test[] . . . in its allegations in order to survive pre-trial termination." 440 F.3d at 344 (emphasis added). The Supreme Court has likewise held that because a plaintiff failed to make a threshold showing that the challenged conduct had the characteristics necessary to justify per se condemnation, rule of reason analysis should apply instead. *Stationers*, 472 U.S. at 298 ("A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects.").

If the record in this case reveals a plausible way in which the challenged restraints contribute to the procompetitive efficiencies of the joint venture, then "the possibility of countervailing procompetitive effects" is not remote and per se treatment is improper. *Id*. at 294. What are Premier's procompetitive efficiencies? The joint operating agreement of Hospital Defendants' joint venture, Premier, states the following goals:

(1) To provide a broad scope and a continuum of health care services with a focus upon community health benefit.

(2) To improve cost effectiveness and efficiencies in the delivery of health care services.

(3) To increase the quality of health care services in the greater Miami Valley Region.

(4) To integrate physicians and other health care providers with the JOC Network.

(5) To have the capacity to assume and manage financial risk.

(6) To improve the health status of the greater Miami Valley Region.

We analyze Hospital Defendants' challenged restraints in light of these goals.[9]

MCEP challenges two kinds of conduct on the part of Hospital Defendants. First, MCEP argues that Hospital Defendants restrained trade through "panel limitations," wherein Hospital Defendants stipulated to payers that if they added MCEP to their networks, Hospital Defendants would be able to renegotiate prices. Second, MCEP alleges that Hospital Defendants took direct concerted action against MCEP by cutting off patient referrals to MCEP-affiliated physicians, evicting MCEP-affiliated physicians from office space owned by Hospital Defendants, and agreeing with third parties to refuse to deal with MCEP-affiliated physicians.

*Panel limitations*. Courts have found such restraints of trade supported by procompetitive justifications. *Stop & Shop Supermarket Co v. Blue Cross & Blue Shield*, 373 F.3d 57, 62 (1st Cir. 2004) (finding that closed networks can allow payers to reduce customer premiums because providers will exchange better rates for guaranteed volume). Likewise in

---

[9]The challenged conduct evaluated in this section is limited to MCEP's claim of illegal concerted action among the Hospital Defendants, not the additional "rim conspiracy" claims. The reason for this is that we conclude in the next section that Judge Rice did not abuse his discretion by ruling that MCEP's effort to plead those claims was untimely.

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, where the Seventh Circuit addressed panel limitations as a mere variant on the accepted restraint of exclusive dealing arrangements:

> But what is more common than exclusive dealing? It is illustrated by requirements contracts, which are common, and legal, and obligate a buyer to purchase all, or a substantial portion of, its requirements of specific goods or services from one supplier. [The Hospital Defendants'] deals with the health insurance companies are a form of requirements contract, for the deals require the companies to limit the network of providers from which they obtain the health care that their insurance contracts obligate them to obtain for their insureds. And an insurance company may get better rates from a hospital in exchange for agreeing to an exclusive contract, as exclusivity will drive a higher volume of business to the hospital.

859 F.3d 408, 410 (7th Cir. 2017).

MCEP claims that Hospital Defendants' argument that panel limitations help ensure volume is a pretext. In support of this claim, MCEP points to evidence showing that Premier's contract with insurer Aetna had a volume-based discount that automatically lowered Premier's rates when billing volume increased past certain benchmarks. Thus, even without panel limitations, Hospital Defendants had financially incentivized insurers to maintain a high volume of patients getting services from Hospital Defendants. To MCEP, this evidence reveals that the only possible purpose of the panel limitation in Hospital Defendants' contract with Aetna was "purely punitive."

We are not persuaded. A panel limitation and a price schedule are two distinct methods directed toward the common goal of keeping patients (customers) coming through the doors. A pricing schedule is a discount that incentivizes payers to keep volume up. A panel limitation, meanwhile, forces payers to confront the risk of renegotiating their contract with Hospital Defendants if they choose to send their insureds (customers) to a competing provider. Moreover, it is plausible that Hospital Defendants would deploy a "belt and suspenders" approach to a matter as crucial for a hospital system as maintaining patient (customer) volume. It is plausible that panel limitations, by lowering the cost of Hospital Defendants' services, contribute to the efficiency-enhancing purposes of the joint venture, specifically improving "cost effectiveness and efficiencies in the delivery of health care services."

*Concerted action regarding physicians*. MCEP's claims concerning Hospital Defendants' *direct* concerted action toward physicians can be divided into two categories: (1) threatened loss of patient referrals; and (2) non-compete agreements.

1. Threatened loss of patient referrals[10]

This alleged restraint centers around evidence found in a letter sent by Hospital Defendants to Dayton-area doctors informing them of Hospital Defendants' opposition to MCEP. The letter, signed by 94 primary care physicians, discusses the consequences that MCEP's presence could have on the Dayton healthcare market. The primary concern expressed in the letter was that the profit-driven MCEP "will take the better insured and more profitable patients away from Premier" and leave "local hospitals with only the more complex and underinsured patients." At the conclusion of the letter, the physicians wrote:

> We, the primary care network of physicians for Premier, strongly oppose [MCEP]. We believe it will have only negative impacts on our community, our hospitals and our network. We do not support the physicians who invest in these inpatient hospitals. We do look forward, however, to our continued efforts to work with the specialists of our hospital medical staffs and do our part within Premier to continue to improve the delivery of cost-effective, highest quality healthcare to the people of our community.

MCEP claims that doctors who signed the letter "understood [it] to mean that signatories would stop referring patients to anyone who invested in MCEP."

Hospital Defendants argue that the letter, in expressing the opinion of Premier and its affiliated physicians, does not constitute a *restraint*, and therefore cannot qualify as illegal conduct under antitrust laws. They are right. In *Am. Council of Podiatrists v. Am. Bd. of*

---

[10]MCEP also argues that Hospital Defendants waived the right to move for summary judgment on this theory of liability because they failed to argue before Judge Black that their direct concerted action should be viewed under the rule of reason. Likely, MCEP intends to say that Hospital Defendants' *forfeited* the argument. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993). Under forfeiture doctrine, "parties are not limited to the precise arguments they made below." *Yee v. Escondido*, 503 U.S. 519, 534 (1992). At worst, MCEP is claiming that Hospital Defendants are making a "new argument to support what has been [their] consistent claim." *Lebron v. Natl'l R.R. Passenger Corp.*, 513 U.S. 374, 379 (1995). Hospital Defendants did not forfeit the right to move for summary judgment on MCEP's claim that Hospital Defendants' direct concerted action is per se illegal because Hospital Defendants have consistently argued that MCEP's per se claim does not apply to the challenged conduct.

*Podiatric Surgery, Inc.*, we held that, in the absence of a showing by the plaintiff that allegedly anticompetitive communication was (1) "false" and (2) "difficult or costly for the plaintiff to counter," we would apply a presumption that speech has "*de minimis* effect on competition." 323 F.3d 366, 370-72 (6th Cir. 2003). MCEP's claim fails under both of these prongs. MCEP has not shown that Hospital Defendants' "Dear Physician" letter was untrue, and MCEP countered the "Dear Physician" letter, without any apparent difficulty, with a "Dear Colleague" letter of its own.

2. Non-compete agreements

MCEP claims that Hospital Defendants terminated the leases of multiple MCEP-affiliated doctors who rented space in Hospital Defendants' hospitals. Judge Rice rejected this argument on the grounds that Hospital Defendants have a legitimate interest as a joint venture in preventing free riding by physicians who will reap the benefits of training and convenient office space at their hospitals and "then refer their patients elsewhere or invest in other hospitals." Hospital Defendants had a plausible concern that, without these contracts, physicians who invested in MCEP could rent office space at a Premier-associated hospital, free ride on the reputation and facilities of that hospital, and then refer patients out to MCEP. Preventing such a misalignment of incentives is plausibly related to Hospital Defendants' goal of "integrat[ing] physicians and other health care providers with the JOC Network."

MCEP also alleges that Hospital Defendants' non-compete agreements with physicians in the Dayton area qualify as concerted conduct subject to per se condemnation. Hospital Defendant Good Samaritan purchased the Dayton Heart Hospital in 2008. As characterized by MCEP, a condition of the purchase by Good Samaritan Hospital was that individual owners of Dayton Heart Hospital were paid in full only if they agreed "(i) not to invest in MCEP, and (ii) if they already owned shares, they would divest if MCEP began to offer cardiac services" over the next five years. MCEP cites no case law holding that vertical non-compete contracts entered into by joint ventures qualify as conduct that is anticompetitive per se.[11] And this circuit, as well as

---

[11]Instead MCEP cites to *E. States Retail Lumber Dealers' Assoc. v. United States*, 234 U.S. 600 (1914), and *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988) (per curiam). Neither case

the common law,**12** have long recognized that "[l]egitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree." *Perceptron, Inc.*, 221 F.3d at 919 (quoting *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981)). It is MCEP's burden to show that per se treatment of allegedly anticompetitive conduct is justified. *Stationers*, 472 U.S. at 298. In this context, MCEP's failure to produce any on-point precedent is damning, as we refuse to apply the per se rule in the absence of judicial experience with the challenged restraint. *See Broad. Music, Inc., v. Columbia Broad. Sys. Inc.*, 441 U.S. 1, 9 (1979) (concluding that "it is only after considerable experience with certain business relationships that courts classify them as *per se* violations") (quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972)).

*MCEP's other arguments in support of its per se claim*. *First*, MCEP argues that we are bound by precedent to find that Hospital Defendants' restraints qualify for per se treatment. To that end, MCEP cites to *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). *Klor's*, however, did not concern a legitimate joint venture, so its approach to alleged horizontal restraints does not bear on the legal framework established above. *Id*. at 208-09. MCEP also argues that *Com-Tel, Inc. v. DuKane Corp.*, 669 F.2d 404 (6th Cir. 1982), which followed *Klor's* approach, controls. But *Com-Tel*, like *Klor's*, does not contain ancillary-restraints analysis because it does not concern a joint venture.

*Second*, MCEP argues that we are bound by "law of the case" to find in its favor because, in *MCEP I*, we implicitly rejected a number of the arguments that Hospital Defendants make here. We need not guess at the contours of *MCEP I*'s holding—we said expressly that it concerned "only . . . whether defendants' conduct is the result of two or more entities acting in

---

concerns joint ventures or the ancillary-restraints doctrine. *Coop. Theatres of Ohio* is inapposite, as it concerns market allocation rather than a group boycott. 845 F.2d at 1368.

**12**"It must have been obvious from the beginning that the flat ban against such restraints of trade covered more than the rationale of the rule required. The rule might prevent desirable transfers of property. The most valuable asset of a business might be the good will of the public toward its owner. Should he wish to sell the business the owner could not get a price reflecting the asset of good will or the true going concern value of his business unless he could promise the purchaser not to return to compete with the business sold." Robert Bork, *Ancillary Restraints & the Sherman Act*, 15 ABA Section of Antitrust Law Proceedings 211, 213 (1959) (footnote omitted).

concert or whether defendants, based on their participation in the joint operating agreement, function as a single entity in the market place." *MCEP I*, 817 F.3d at 939.

**B.**

Rim Conspiracy claims

MCEP argues that Judge Rice erred in dismissing its Section 1 claims of concerted action based on "rim" conspiracies—that is, agreements (induced by Hospital Defendants) to boycott MCEP made among the payers as well as independent physicians. The rim conspiracies are distinct from the alleged conspiracy among the Hospital Defendants. MCEP argues that Hospital Defendants orchestrated two additional conspiracies—one among payers to collectively "hold the line" against MCEP by excluding it from their market, the other a "physician conspiracy" in which Hospital Defendants induced Dayton-area physicians to collectively refuse to refer patients to MCEP. As Judge Rice noted, this issue is significant. Hospital Defendants "conceded that, if MCEP could prove that the payers agreed among themselves not to offer MCEP a managed care contract and that Premier orchestrated that agreement, the *per se* rule would apply to that claim." If the district court erred by precluding these rim conspiracy claims, then even if Judge Rice was correct that MCEP has no triable per se claim of concerted action among Hospital Defendants (the "hub" claim), the case would need to be remanded and set for trial on MCEP's rim conspiracy claim.

MCEP argues that the rim conspiracy claims are not new. Instead, MCEP characterizes the rim agreements as additional evidence found through discovery that supports the overarching group boycott claim advanced in the Amended Complaint. MCEP undermines that position, however, by claiming simultaneously that "[t]he payer agreement and physician agreement . . . represent additional horizontal concerted action that *independently* requires imposition of the per se rule whether the jury finds the Defendants to be a single entity or multiple actors."

But MCEP's Amended Complaint includes neither an allegation of an agreement among the payers nor an agreement among the physicians.[13] Instead, the Amended Complaint alleges

---

[13]MCEP's counsel acknowledged this fact in the course of a deposition, asserting: "I'll represent to you [to the deponent] that *there was not an allegation of an outer rim in the complaint*, but that MCEP contends that the

an agreement among the Hospital Defendants to financially induce payers and physicians to boycott MCEP. There is no "rim" conspiracy without alleged *agreement* among the parties at the rim (among the payers and physicians, respectively). *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008). Because the Amended Complaint lacks an essential element for MCEP's "rim" conspiracy claims, the Amended Complaint does not include those claims.

Faced with that omission, MCEP claims that Judge Rice erred by not permitting MCEP to submit a Second Amended Complaint to add the rim conspiracy claims. We review for abuse of discretion the district court's decision to deny such a motion. *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999). We will overturn the district court's decision only if we have a "definite and firm conviction that the court below committed a clear error in judgment in the conclusion it reached upon a weighing of the relevant factors." *Taylor v. United States Parole Comm'n*, 734 F.2d 1152, 1155 (6th Cir. 1984) (citation omitted); *see also John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008). The standard for a motion to amend is governed by the general principle that "cases should be tried on their merits rather than the technicalities of pleadings," which is in turn moderated by the exception that judges should allow amendment only when doing so does not "cause prejudice to the defendants" or undue delay. *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982).

The district court found that Hospital Defendants "would be severely prejudiced if MCEP were permitted to amend its Complaint at this late date" primarily for the reason that a proper adjudication of the rim conspiracy claims would require a new round of discovery that could last well over a year. The district court was unmoved by MCEP's arguments that amending its complaint would not cause prejudice because Hospital Defendants had been "on notice" of the rim conspiracy claims since MCEP filed its Omnibus Opposition to Defendants' Motions for Summary Judgment.

The district court did not abuse its discretion by concluding that its allowing MCEP to amend its complaint for a second time would require a new round of discovery that would cause

---

evidence developed through discovery establishes the existence of an outer rim, meaning an understanding among two or more payers that each had agreed with the defendants not to expand their hospital panel."

undue delay and prejudice Hospital Defendants by significantly extending litigation that began in 2012. *Tefft* does not save MCEP on this point. In that case, it was "obvious that the facts as set forth in Tefft's original complaint would support [the new] cause of action . . . as well as [the original cause of action]." *Id*. at 639. That is not the case here, where the facts as set forth in MCEP's Amended Complaint do *not* support MCEP's different rim conspiracy claims. This case is more like *Super Sulky*, where a plaintiff moved to amend his complaint to add an additional Section 1 theory that was absent from the original complaint, but *had* been raised in response to a motion for summary judgment—in short, the circumstance here. The district court denied that plaintiff's motion to amend and we affirmed. *Super Sulky*, 174 F.3d at 740-41.

Judge Rice did not abuse his discretion when he denied MCEP's motion to amend its complaint.[14]

## IV.

Because Judge Rice was correct to find that the challenged restraints do not fall within the circumscribed categories of per se condemnation, we AFFIRM the district court's grant of summary judgment.

---

[14]MCEP raised two additional claims on appeal—that the district court erred in dismissing Catholic Heath Initiatives and that the case should be remanded to Judge Black rather than Judge Rice. Both arguments are mooted because we affirm the district court's summary judgment in favor of Hospital Defendants.

———————————

## CONCURRENCE

———————————

SUTTON, Circuit Judge, concurring.   I join Judge Batchelder's thoughtful opinion in full.  I write separately to discuss the law-of-the-case doctrine and to explain why it does not apply to the prior panel's decision.

What we call law of the case has two parts.  The first part, known as the "mandate rule," is vertical.  A lower court "is bound by the decree [of a higher court] as the law of the case, and must carry it into execution according to the mandate." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895).  The rule springs from the hierarchical structure of our judicial system and leaves no room for discretion.  If the U.S. Supreme Court resolves an issue in a case and remands the matter to us, we are duty bound to follow the mandate of the superior court.  So too at the trial level.  If we decide an issue and remand the case, the trial court must carry out its duties in accordance with that mandate.  *See* Bryan A. Garner et al., *The Law of Judicial Precedent* 459–60 (2016).

The second part, the part implicated by this case, is horizontal.  It "expresses the practice of courts generally to refuse to reopen what has been decided" by an earlier panel of the same court in the same case.  *Messenger v. Anderson*, 225 U.S. 436, 444 (1912) (Holmes, J.).  Unlike its upward counterpart, the sideways version of the law of the case is "not a limit to [a court's] power." *Id.*  A later panel of an appellate court, like a district court, "has the power to revisit prior decisions of its own or of a coordinate court in any circumstance." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988).  That is what happened when Judge Rice took over this case, reconsidered Judge Black's opinion, came to a different conclusion, and granted summary judgment to Premier.  *See supra* at 7; Garner, *supra*, at 474, 487–88.

Today, we sit in essentially the same position as Judge Rice.  A prior panel of our court decided that Premier was not a single entity under the Sherman Act.  *See Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 936 (6th Cir. 2016).  One judge dissented.  *Id.* at 945 (Griffin, J., dissenting).  Now the case has returned.

As I see it, the dissent got it right. Section 1 of the Sherman Act "does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (quotation omitted). Officers and divisions within a single entity cannot collude in a way that violates § 1. Single-entity status depends on economic realities rather than labels. Whether or not they keep their separate corporate identities, participants in a joint venture merge into a single entity if (1) their agreement creates a "complete unity of interest," *id.* at 771, and (2) they receive orders from a single decisionmaking center, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010).

Premier qualified as a single entity.

Complete unity of interest? Check. The hospitals shared profits and losses according to a distribution schedule that did not change based on any one hospital's performance. That means that each hospital in the joint venture benefited when another hospital succeeded even if that other hospital drew patients and profits away.

Single decisionmaking center? Check again. Premier served as the "operator" for all the joint venture's health system activities and had the power to negotiate managed care contracts, fire hospital executives, dictate their budgets, and plot the strategic course each hospital took. *Med. Ctr.*, 817 F.3d at 950 (Griffin, J., dissenting).

The law-of-the-case doctrine does not prohibit us from reviewing that ruling. And I would suggest we do so in this case save for one reality: It makes no difference to the outcome. Either way, Premier rightfully prevails.

No doubt, it's often said that courts at all levels should be "loathe" to overturn their earlier opinions unless they are "clearly erroneous" and cause a "manifest injustice." *Christianson*, 486 U.S. at 817 (quotations omitted). But what does that mean? Surely, a legal ruling does not become more insulated from reversal by a senior court every time the junior court refuses to reconsider a prior ruling. The "clear error" and "manifest injustice" phrases must refer to something else. They instead are a reminder that courts should not lightly reconsider prior rulings in the same case—lest we scramble the expectations of the parties *and* encourage serial efforts to revisit prior rulings. These are, in other words, self-enforced standards, not the

standard a senior court uses to review a reconsidered ruling.  There is no such thing as upholding an erroneous, but not clearly erroneous, legal ruling in this setting.  Accordingly, if a court revisits a prior legal ruling, that does not transform the standard of review from de novo to clear error.  *See* Garner, *supra*, at 447.

———————————

**DISSENT**

———————————

HELENE N. WHITE, Circuit Judge, dissenting in part.  I agree with the majority's conclusion that the rule of reason applies to the alleged conspiracy involving concerted action by the Hospital Defendants.  However, I disagree with the majority's determination regarding the rim conspiracy involving the payers.

The majority acknowledges that there is evidence of horizontal concerted action among the payers, orchestrated by Defendants, not to provide MCEP a managed-care contract (i.e., the "rim conspiracy"), and that the per se rule would apply to that conspiracy.  The majority nevertheless concludes that MCEP cannot present that evidence to a jury because (1) it constitutes a separate, unpled claim from the conspiracy claim that MCEP pled; and (2) Judge Rice did not abuse his discretion in determining that allowing MCEP to amend its complaint to include this claim would prejudice Defendants.  Because the allegations in MCEP's Amended Complaint encompass this rim conspiracy; the evidence was known by Defendants early in the proceedings; this court discussed the evidence of a rim conspiracy in the first appeal; Judge Black relied on the evidence of a rim conspiracy in denying Defendants' summary judgment motions after remand; and Defendants failed to seek the purported necessary additional discovery in a timely fashion, I would reverse the grant of summary judgment and remand for trial.  Accordingly, I respectfully dissent.

The majority's recitation of the procedural history of this case omits important details that bear on whether the rim conspiracy should proceed to trial.  After Defendants moved for summary judgment on the basis that they were a single entity and thus incapable of conspiring, MCEP affirmatively raised the rim conspiracy, arguing in opposition to Defendants' motion that evidence of concerted action by the payers—what MCEP called "an additional facet to th[e] conspiracy" it pled (R. 139, PID 10136)—meant that the plurality requirement was met and that the alleged conspiracy would still be subject to per se treatment even if Defendants were a single entity.  In reply, Defendants did not argue that the rim conspiracy constituted a separate and untimely alleged conspiracy; and they did not argue that they needed additional discovery

regarding this concerted action.  Rather, they argued only that there was insufficient evidence of the rim conspiracy, forfeiting any timeliness argument.

It was not until the first appeal that Defendants challenged the rim-conspiracy claim as not encompassed within MCEP's Amended Complaint, and therefore untimely.  Defendants also argued that they would be prejudiced by adding this new theory to the case, and stressed at oral argument in the first appeal that they would need additional discovery to defend against the allegation of horizontal concerted action by the payers.  Despite Defendants' argument, the prior panel expressly considered evidence of the rim conspiracy in its majority opinion:

> Plaintiff has submitted evidence that each insurer knew that the other insurers had included this [panel] limitation in their contracts, as demonstrated by the excerpt below from a Dayton industry publication:
>
>> Premier has threatened to revoke privileges for physicians participating in [plaintiff hospital] and contracts with health plans such as Anthem and UnitedHealth are known to be contingent on excluding [plaintiff hospital] from the network.
>
> In addition to this published account, plaintiff also offered evidence from insurance company emails and defendant hospitals' Board of Directors meetings that, in addition to demonstrating knowledge among the insurers of the restriction on adding new hospitals to their networks in their managed-care contracts with defendant hospitals, the insurance companies regularly monitored each other to ensure that the other insurance companies were complying with the contract restriction on dealing with a new hospital.

*Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 941–42 (6th Cir. 2016) (hereafter *MCEP I*) (second and third alterations in original) (internal citation omitted).

After remand, Judge Black issued an order requesting briefing regarding the effects of the opinion in *MCEP I* on Defendants' previously filed summary judgment motions.  In their reply brief, Defendants summarily argued, for the first time before the district court, that the horizontal concerted action by the payers was not pled and that adding that theory to the case would prejudice them.  Defendants did not request additional discovery on that issue, however.

In denying Defendants' remaining summary judgment motions, to support his conclusion that the per se rule applies to MCEP's antitrust claim, Judge Black discussed and relied on

evidence that at the behest of Defendants, the payers joined in an agreement not to deal with MCEP.[1]

After Judge Black denied Defendants' remaining summary judgment motions, and despite this court's and Judge Black's opinions indicating that the rim conspiracy was part of the case and Defendants' representation to this court that they would need additional discovery to defend against that theory, Defendants still did not request additional discovery. Instead, more than seven months later, after Judge Black recused himself and only a couple of months before trial was scheduled to begin, Defendants made the same untimeliness argument to Judge Rice, arguing that they would be prejudiced if the rim conspiracy was included at trial and that they would need 12–18 months of additional discovery. As the majority explains, Judge Rice accepted those arguments, finding that the rim conspiracy was not alleged in the Amended Complaint and that MCEP could not file a Second Amended Complaint because Defendants would be prejudiced by the delay.

Given this chronology, I would reverse the district court's grant of summary judgment and allow the rim conspiracy, which all agree is subject to the per se rule, to proceed to trial. This conclusion is not dependent on whether the law of the case applies, but rather on whether the issue was fairly included in the case. First, MCEP's Amended Complaint expressly alleges a group boycott subject to per se condemnation involving Defendants and the payers. The horizontal concerted action by the payers, orchestrated and monitored by Defendants, can reasonably be construed as part of this single, overarching conspiracy. This conclusion is reinforced by Defendants' failure to argue in their summary judgment briefs before the first appeal that the rim conspiracy was not encompassed within the Amended Complaint; and this

---

[1]Because Judge Black construed MCEP's claim as encompassing the rim conspiracy, his conclusion that the per se rule applied to MCEP's claim is reasonable. Further, despite the majority's conclusion "that then-Judge Sotomayor's concurrence in *MLB Properties*" is "[p]erhaps most destructive to" Judge Black's framing of the ancillary-restraints doctrine (Maj. Op. at 13), then-Judge Sotomayor's concurrence in *MLB Properties* stated at several points that the restraint must be "reasonably necessary" to the efficiency-enhancing benefits of the joint venture. *See, e.g.*, 542 F.3d at 338 (explaining that a per se approach may apply to joint ventures where "a particular challenged restraint is not reasonably necessary to achieve any of the efficiency-enhancing benefits of a joint venture and serves only as naked restraint against competition"). Thus, the majority's critique of Judge Black's formulation of the ancillary-restraints doctrine—requiring the restraint to be necessary to an efficiency-enhancing purpose of the joint venture—is not entirely fair given the broader context of his ruling.

court's and Judge Black's express reliance on evidence of the rim conspiracy when discussing the merits of this case.

Second, Defendants' prejudice argument is unavailing in light of their failure to (1) argue prejudice in their initial summary judgment briefing, and (2) seek the discovery they told this court they would need in October 2015, despite the opportunity to do so for months.  Rather than seek the discovery they claimed to need, Defendants moved forward with trial preparations before deciding to try their untimeliness argument a third time on a different judge after it failed to persuade either this court or Judge Black.

More fundamentally, the majority's affirmance of the dismissal of the rim conspiracy deprives MCEP of any remedy based on a pleading technicality even though all agree that there is sufficient evidence that Defendants and the payers conspired to exclude MCEP from the market in a way that is per se illegal—i.e., in a way that is "so inherently anticompetitive that [the agreement] is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) (citation omitted).  Because "cases should be tried on their merits rather than the technicalities of pleadings," *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir. 1982), I would remand the rim conspiracy for trial.